# SUMMONS AND COMPLAINT

4/14/11

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

ORIGINAL FILED
LOS ANGELES SUPERIOR COURT
JOHN A. CLARKE, CLERK

APR 0 1 2011

By: _____
DEPUTY

**NOTICE TO DEFENDANT:** GLEN ROSE PETROLEUM, a Delaware corporation;
*(AVISO AL DEMANDADO):* BLACKWOOD CAPITAL LIMITED, a limited
liability company, organized in Gibraltar; ANDREW KIMMINS aka ANDREW
TAYLOR-KIMMINS, an individual; MJH ASSET MANAGEMENT SA, a company
Additional Parties Attachment form is attached.

**YOU ARE BEING SUED BY PLAINTIFF:** THOMAS J. PERNICE, an individual
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Superior Court of California, County of Los Angeles
1725 Main Street
Santa Monica, California 90401

CASE NUMBER:
*(Número del Caso):* SC11____

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: Jack Utter
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Law Offices of Jack Utter
2020 Main St. Suite 900, Irvine CA 92614   (949) 955-9136

DATE: APR 0 1 2011   Clerk, by _____ Denham , Deputy
*(Fecha):*   *(Secretario)*   *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
   Glen Rose Petroleum, a Delaware corporation
3. ☒ on behalf of *(specify):*

   under: ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
            ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
            ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
            ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov
proDOC®

| | |
|---|---|
| SHORT TITLE: PERNICE V. GLEN ROSE PETROLEUM, et al. | CASE NUMBER: |

**SUM-200(A)**

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff   [X] Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

incorporated in Switzerland; and DOES 1 through 50, inclusive.

Page __1__ of __1__

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

ProDoc®

1  Jack Utter, Esq.
   Law Offices of Jack Utter
2  2020 Main Street, Suite 900
   Irvine, California 92614
3  (949) 955-9136
   SBN # 92066
4

5  Attorney for Plaintiff, Thomas Pernice

6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9           COUNTY OF LOS ANGELES, WEST JUSTICE CENTER

10  THOMAS J. PERNICE, an individual,        )  Case No.  SC112070
                                             )
11                                           )  **COMPLAINT FOR:**
                  Plaintiff,                 )
12                                           )  1. **Breach of Written Contract;**
             v.                              )  2. **Breach of the Covenant of Good Faith**
13                                           )     **and Fair Dealing;**
    GLEN ROSE PETROLEUM, a Delaware          )  3. **Breach of Oral Contract;**
14  corporation; BLACKWOOD CAPITAL LIMITED,  )  4. **Negligent Misrepresentation;**
    a limited liability company, organized in Gibraltar; )  5. **Intentional Misrepresentation;**
15  ANDREW KIMMINS aka ANDREW TAYLOR-        )  6. **Fraud and Deceit;**
    KIMMINS, an individual; MJH ASSET        )  7. **Breach of Fiduciary Duty;**
16  MANAGEMENT SA, a company incorporated in )  8. **Breach of Statutory Duty.**
    Switzerland; and DOES 1 through 50, inclusive. . )
17                                           )  Assigned for all purposes to:
                                             )  Honorable Judge
18               Defendants.                 )  Dept.
                                             )
19  _____ )  JURY TRIAL DEMANDED

20

21       Plaintiff, **THOMAS PERNICE**, an individual, alleges as follows:

22                      <u>**GENERAL ALLEGATIONS**</u>

23       1.      At all times mentioned herein, THOMAS J. PERNICE ("PERNICE"), is an individual

24  currently residing in the County of Los Angeles, State of California and was a member of the Board of

25  Directors of defendant, United Heritage Company (a public company) ("UHC"), subsequently renamed

26  GLEN ROSE PETROLEUM CORPORATION ("GRP"); PERNICE, originally a member of the Board

27  of Directors and a holder of options with United Heritage Corporation, is an Option Holder in UHC/

28

_____
COMPLAINT                              1

1  GLEN ROSE PETROLEUM, wherein UHC entered into Stock Option agreements dated April 2004

2  (Option 1), the Stock Option Agreement UHC and PERNICE dated May 2005 (Option 2); and its

3  Amendment, June 2004; and the Amendment to Stock Option Agreement, February 16, 2006 (re Put

4  Options with optionee's (PERNICE's) right to exercise option 4/1/2008 through 4/10/2008) .   The

5  Stock Option Agreements of April 2004, Amendment, June 2004, Stock Option Agreement, May 2005

6  and its Amendment of February 16, 2006 are herein collectively referred to as the "WRITTEN

7  CONTRACT" and attached hereto as Exhibit 1, and incorporated herein by this reference as though set

8  forth in full.

9          2.      At all time mentioned herein, the Glen Rose Petroleum, Novation and Note Acquisition

10  Agreement dated February 5, 2010 ("NNAA"), is an Agreement proposed to PERNICE as well as other

11  Members of the Board of Directors of UHC.   The proposed, unsigned "NNAA" confirms and

12  acknowledges  the WRITTEN CONTRACT between PERNICE and UHC which includes, but is not

13  limited to, the February 16, 2006, Amendment to the Stock Option Agreements, granting Option

14  Holder, PERNICE, a "Put Option" to be exercised between April 1, 2008 and April 10, 2008.  (See

15  Exhibit "2" attached hereto and incorporated herein as set forth in full by this reference.) .

16          3.      At all times mentioned herein, defendant, BLACKWOOD  CAPITAL  LIMITED

17  ("BLACKWOOD"), is a limited liability company organized in Gibraltar, having an office at Rue Du

18  Rhone 14, Geneva-1204, Switzerland,  100% owned by Andrew Tayor-Kimmins, which in or about

19  2006 entered into an agreement with UHC (and/or through Blackwood Capital Partners, LLC),

20  becoming the majority shareholder of UHC.

21          4.      UHC, a public company, in accordance with the merger with BLACKWOOD, changed

22  its name to GLEN ROSE PETROLEUM ("GRP"). In accordance with BLACKWOOD'S agreement

23  to purchase UHC, the Board of Directors of UHC resigned; the options held by PERNICE were

24  converted to a put right (the "Put Options"), as set forth in the 2/16/2006 Amendment to Stock Option

25  Agreement between UHC/PERNICE, allowing the UHC directors to put their shares/options to the

26  company, in or about April 1, 2008 through April 10, 2008 ("Put Period"), at a set price.

27  ///

28

COMPLAINT                                    2

5.      In or about June, 2009, the total of the PERNICE "Put Options" were valued at $166,667.50; and, in or about September 2010, the Put Options became valued at $186,507.76, which included interest thereon at the rate set forth in the GRP NOTE dated February 5, 2010 (Exhibit A to the NNAA) (hereinafter referred to as the "NOTE").

6.      At all times mentioned herein, Defendant, GLEN ROSE PETROLEUM CORPORATION ("GRP") is a Delaware corporation with its principal place of business at 22762 Westheimer Parkway, Suite 515, Katy, Texas 77450, which, in or about 2006, in accordance with the merger between UHC/BLACKWOOD took the new name of Glen Rose Petroleum ("GRP").

7.      In or about April 1, 2008, PERNICE exercised his "Put Options"with GRP/BLACKWOOD, as agreed, pursuant to the Amendment to Stock Option Agreement of 2/16/2006. At the time of the exercise of PERNICE's Put Options, the Put Options were valued at $166,667.50.

8.      In or about February 5, 2010, subsequent to exercise of the PERNICE "Put Options", GRP negotiated with all of the Put Holders to accept a long term promissory note (the "NOTE"), to defer performance on the Put Options into 2011, with an option to extend, as set forth in the "NNAA". Based on agreements with each of the Put Holders, the value of the Put Options was increased at the rate of 4% per annum (in accordance with the rate payable under the Unsecured Note, dated on or about February 5, 2010) (the "NNAA/NOTE").

9.      On or about February 5th through September 24, 2010, GRP began negotiations with PERNICE for the purchase of the $186,507.76 Unsecured NOTE from GRP, i.e., an agreement to purchase the GRP liability to PERNICE for the amounts owing to PERNICE, (regarding PERNICE's exercise of the Put Option), agreed to be $186,507.76 as evidenced by the NOTE, "payable September 30, 2011 unless extended through September 30, 2012". In accordance with the NNAA/NOTE, PERNICE would be required to accept the terms of the NOTE and sign the General Release (Exhibit B to the NNAA) which would eliminate PERNICE's current claim against GRP, as a condition precedent  to the actual purchase of the NOTE by KIMMINS.

10.      PERNICE did not accept the terms and did not sign the Novation and Note Acquisition Agreement ("NNAA/NOTE").

COMPLAINT                                    3

11.     At all times mentioned herein, defendant, ANDREW KIMMINS aka ANDREW TAYLOR-KIMMINS (collectively referred to herein as "KIMMINS"), is an individual, who is a citizen of the United Kingdom, currently residing in Switzerland, and is Chairman of the Board, CEO and President and the controlling person of GRP and 100% owner of BLACKWOOD.

12.     At all times mentioned herein defendant, MJH ASSET MANAGEMENT SA, ("MJH") is a company incorporated in Switzerland affiliated with GRP/BLACKWOOD, which is owned and managed by KIMMINS, having an office at Rue Du Pont 2, Geneva-1204, Switzerland.

13.     In or about June to September 2010, KIMMINS proposed a private purchase by KIMMINS and/or KIMMINS' "fund" (the "fund" based on knowledge and belief to be MJH), of GRP's liability to PERNICE. An Agreement was made between PERNICE and KIMMINS/MJH and/or other private KIMMINS "fund", in which PERNICE (seller/assignor), would sell/assign to MJH Asset Management SA ("MJH") (purchaser/assignee), all of PERNICE's right, title and interest in and to the Debt Security (the NOTE), in consideration for a discounted purchase price of an "immediate" lump sum of $120,000 (the ORAL AGREEMENT), as more specifically set forth in the Debt Sale and Purchase Agreement and its Exhibits (Assignment of Debt and General Release) (collectively the "DSPA") between PERNICE and MJH, dated September, 2010 (Exhibit 3 attached hereto and incorporated herein by this reference as though set forth in full).

14.     In or about September 2010, KIMMINS provided to PERNICE a Purchase Agreement and Board of Directors Resolution from KIMMINS' "fund" (MJH).   An escrow account was opened by the attorney for PERNICE for deposit of the purchase funds. Since June, 2010 to the present time, KIMMINS has delayed, continues to delay and has failed to perform the agreed upon transaction, i.e. purchase of PERNICE's right, title and interest in and to the Debt Security (the NOTE) in consideration for the discounted purchase price, as promised..

15.     Defendants, GRP, BLACKWOOD, KIMMINS and MJH MANAGEMENT, shall collectively hereinafter be referred to as "DEFENDANTS".

16.     PLAINTIFF is ignorant of the true names and capacities of DEFENDANTS sued herein as DOES 1 through 50, inclusive, and therefore sues said Defendants by such fictitious names.

COMPLAINT                                    4

1   PLAINTIFF will seek leave of Court to amend this Complaint when their true names and capacities are

2   ascertained.

3        17.    PLAINTIFF is informed and believes and thereupon alleges that each of the fictitiously

4   named Defendants is responsible in some manner for the occurrences herein alleged and that

5   PLAINTIFF'S damages as herein alleged were proximately caused by their conduct.

6        18.    Plaintiff is informed and believe and thereon alleges that the fictitiously named

7   Defendants, and each of them, were the agents, servants and employees of each of the remaining

8   Defendants and were at all times herein mentioned acting within the course, scope and purpose of such

9   agency, service and employment with the permission, consent and ratification of each of the remaining

10  Defendants.

11                                  **JURISDICTION**

12       19.    The transactions and events which are the subject matter of this Complaint all occurred

13  within the County of Los Angeles, State of California; the County of Los Angeles is the county where

14  the contract was made and is to be performed; the obligation arose in the County of Los Angeles; the

15  breach occurred in the County of Los Angeles, State of California.

16                              **FIRST CAUSE OF ACTION**

17                              **(Breach of Written Contract)**

18              (As Against Glen Rose Petroleum, Andrew Kimmins and Blackwood)

19       20.    Plaintiff realleges and incorporates herein by reference each and every allegation set forth

20  in paragraphs 1 through 19 of the General Allegations as though set forth in full herein.

21       21.    PERNICE, originally a member of the Board of Directors and a holder of options with

22  United Heritage Corporation, is an Option Holder in accordance with the merger between GLEN ROSE

23  PETROLEUM and United Heritage Corporation ("UHC").

24       22.    UHC entered into option agreements with PERNICE, dated April, 2004 (Option 1) and

25  May , 2005; Amendment to Option Agreement, June, 2004; and Amendment to Stock Option

26  Agreement, February 16, 2006 (Stock Option Agreement 4/2004, 2005, and Amendments 2004 and

27  2/16/2006, collectively referred to herein as the WRITTEN CONTRACT). (Exhibit 1 attached hereto).

28

COMPLAINT                                        5

23.     In accordance with BLACKWOOD'S agreement to merge/purchase UHC (and name change to GRP), the Board of Directors of UHC resigned; the options held by PERNICE were converted to a put right (the "Put Options"), as set forth in the 2/16/2006 Amendment to Stock Option Agreement between UHC/PERNICE, allowing the UHC directors to put their shares/options to the company, in or about April 1, of 2008 to April 10, 2008, at a set price.

24.     In or about June, 2009, the total of the PERNICE "Put Options" were valued at $166,667.50. The Put Options became valued at $186,507.76 in or about September 2010, which included interest thereon at the rate set forth in the GRP NOTE dated February 5, 2010.

25.     In or about April 1, 2008, PERNICE timely exercised his "Put Options" with GRP/BLACKWOOD, as agreed.

26.     Timely exercise of the PERNICE Put Options was acknowledged by GRP in the subsequent NNAA, referenced above in the General Allegations

27.     At the time of the WRITTEN AGREEMENT, defendants, GRP/BLACKWOOD, KIMMINS  realized that any breach of the WRITTEN AGREEMENT would result in damage to PERNICE causing PERNICE to lose $186,507.76, the value of the Put Options.

28.     Plaintiff, PERNICE, has performed all of the conditions, and covenants required of him under the terms of the WRITTEN AGREEMENT.

29.     Even though PERNICE has repeatedly demanded that GRP/BLACKWOOD and KIMMINS, perform under the terms of the WRITTEN AGREEMENT, in breach of the WRITTEN AGREEMENT, GRP/BLACKWOOD and KIMMINS have failed and refused to perform as agreed, failed and refused to pay PERNICE in accordance with the terms of the WRITTEN AGREEMENT.

30.     As a direct and foreseeable result of GRP/BLACKWOOD and KIMMINS' breach of the WRITTEN AGREEMENT, PERNICE has been damaged in accordance with the terms of the WRITTEN AGREEMENT in a sum to be determined at time of trial but in no event less than $186,507.76.

///

///

COMPLAINT                                                    6

## SECOND CAUSE OF ACTION

**(Breach of the Covenant of Good Faith and Fair Dealing)**

(As Against Glen Rose Petroleum, Andrew Kimmins and Blackwood)

31.     Plaintiff realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 19 of the General Allegations and paragraphs 20 through 30 of the First Cause of Action as though set forth in full herein.

32.     At all times mentioned in this Complaint, in the contract between PERNICE and DEFENDANTS there was an implied covenant that each party (a) not do anything which would deprive the other of the benefits of the contract; (b) that DEFENDANTS would act in good faith and deal fairly with PERNICE and that they would do nothing to interfere with the rights of PERNICE to receive the benefits of the contract; (c) do everything that the contract pre-supposed that DEFENDANTS will do to accomplish its purpose; (d) that DEFENDANTS would act in accordance with the terms of the written contract.

33.     DEFENDANTS owed PERNICE a duty to not act to deprive PERNICE of the fruits and benefits under the above contract; and owed PERNICE a duty not to interfere with PERNICE's reasonable expectations under the contract.   These reasonable expectations included that PERNICE, a member of the Board of Directors, would receive Stock Options/Put Options as agreed; and that DEFENDANTS would not act to undercut that central objective by failing to purchase the PERNICE Put Options as promised.

34.     PERNICE has fully performed, or was excused from performing, including all the conditions and covenants required of him under the Written and Oral Contracts referenced herein in this Complaint.

35.     DEFENDANTS have failed to properly perform, without good cause, pursuant to the terms of the WRITTEN Contract.   DEFENDANTS breached the Contract entered into between PERNICE and DEFENDANTS.

36.     DEFENDANTS' above stated representations in the Contract, were false and fraudulent in that DEFENDANTS never intended to purchase the GRP liability to PERNICE for the amounts

1   owing to PERNICE with respect to PERNICE's exercise of the Put Options; never intended to purchase

2   the $186,507.76 Unsecured NOTE from GRP, as agreed; and instead, stalled delayed, manipulated,

3   deceived, and refused to purchase the $186,507.76 Unsecured NOTE from GRP, refused to pay

4   $186,507.76 to PERNICE, as agreed, holding the funds for DEFENDANTS' own use and benefit;

5   thereby depriving PERNICE of the benefits of the WRITTEN Contract.

6       37.    PERNICE, at the time the representations regarding the WRITTEN Contract were made,

7   believed these representations to be true and, in reliance on the representations were induced to, and

8   did, enter into the Contract with DEFENDANTS; PERNICE, contributed his time, knowledge and

9   expertise as a member of the Board of Directors of UHC, as agreed; had PERNICE known the true

10  facts, he would not have entered into the WRITTEN contract, as alleged in the First Cause of Action

11  above, with DEFENDANTS.

12      38.    At all times herein material, DEFENDANTS knew that PERNICE was legally entitled

13  to the benefits of the WRITTEN Contract and that DEFENDANTS were therefore, under a duty to

14  perform as alleged in the WRITTEN Contract as set forth in the First Cause of Action above.

15      39.    Notwithstanding DEFENDANTS' knowledge of their obligation to perform under the

16  WRITTEN contract, and not to do anything which would interfere with the terms of the contract,

17  DEFENDANTS falsely represented their intent to purchase the GRP liability to PERNICE; deliberately

18  failed to purchase the $186,507.76 Unsecured NOTE from GRP; and failed and refused to perform in

19  accordance with the WRITTEN contract.

20      40.    At all times mentioned in this Complaint, DEFENDANTS had a duty to deal fairly and

21  in good faith with PERNICE and not to do anything that would deprive PERNICE of PERNICE's rights

22  to receive the benefits of the contract with DEFENDANTS. PERNICE had reasonably and justifiably

23  relied upon DEFENDANTS to act in good faith and to honor its/their duty to deal fairly by performing

24  in accordance with the terms of the contract. DEFENDANTS took PERNICE's time, knowledge and

25  expertise as a member of the Board of Directors of UHC, from PERNICE, and then, failed and refused

26  to purchase the PERNICE Put Options, as agreed, thereby depriving PERNICE of the benefits of the

27  contract, for DEFENDANTS own use and benefit. DEFENDANTS' breached the covenant of good

28

COMPLAINT                                    8

1   faith and fair dealing by breaching the contract between PERNICE and DEFENDANTS by virtue of

2   the acts, misrepresentations and omissions and refusals specified in the preceding paragraph of this

3   Complaint.

4        41.   As a proximate result of DEFENDANTS' breach of the covenant of good faith and fair

5   dealing hereinabove alleged, PERNICE has suffered and  continues to suffer the loss of the monies

6   owed to him and damages alleged in the breach of contract cause of action above, in an amount to be

7   proven at trial but in no event less than $186,507.76.

8        42.   As a further proximate result of DEFENDANTS' breach of the covenant of good faith

9   and fair dealing, it was reasonably necessary for PERNICE to retain the services of an attorney to

10   commence this litigation in order to obtain the benefits due under the agreements.  PERNICE has

11   incurred and will continue to incur reasonable attorneys fees and other costs in these efforts, the exact

12   amount of which have not yet been ascertained but in excess of the jurisdictional minimum of this court

13   and will be shown according to proof at time of trial.

14   **THIRD CAUSE OF ACTION**

15   **(Breach of Oral Contract)**

16   (As Against All Defendants)

17        43.   Plaintiff realleges and incorporates herein by reference each and every allegation set forth

18   in paragraphs 1 through 19 of the General Allegations and paragraphs 20 through 30 of the First Cause

19   of Action and paragraphs 31 through 42 of the Second Cause of Action as though set forth in full herein.

20        44.   In or about April 1, 2008, upon exercise of the PERNICE "Put Options",

21   GRP/BLACKWOOD, negotiated through its/their CEO, KIMMINS, with all of the Put Holders, to

22   accept a long term promissory note ( the "NOTE") and to defer performance on the Put Options into

23   2011, with an option to extend.  The proposal was memorialized in the Novation and Note Acquisition

24   Agreement, February 5, 2010 ("NNAA"), as referenced in Exhibit 2 hereto.

25        45.   PERNICE did not accept the terms of the NOTE ("NNAA").  On or about February

26   2010, KIMMINS, CEO for GRP, began negotiations with PERNICE for a private purchase by

27   KIMMINS and/or KIMMINS' "fund" (the "fund" based on knowledge and belief to be MJH) of the

28

COMPLAINT                     9

1   GRP liability to PERNICE.  KIMMINS  proposed a private, separate Agreement in which PERNICE

2   (seller/assignor), would sell/assign to MJH Asset Management SA ("MJH") (purchaser/assignee) all

3   of PERNICE's right, title and interest in and to the Debt Security (the NOTE), in consideration for a

4   discounted purchase price of an "immediate" lump sum of $120,000 (the ORAL AGREEMENT), as

5   more specifically set forth in the Debt Sale and Purchase Agreement and its Exhibits (Assignment of

6   Debt and General Release) (collectively the "DSPA") between PERNICE and MJH dated September,

7   2010; and further the DSPA dated October, 2010, in which the purchaser/assignee's name is left blank,

8   (hereinafter referred to as the "ORAL CONTRACT"), as referenced in Exhibit 3 (a), 3(b) attached

9   hereto and incorporated herein by this reference as though set forth in full.

10          46.     In furtherance of the Oral Agreement, in or about June 2010, KIMMINS provided to

11   PERNICE a Purchase Agreement and Board of Directors Resolution from KIMMINS' "fund" (MJH),

12   in  which  KIMMINS  would  have  PERNICE,  as  a  condition  precedent  to  payment  by

13   KIMMINS/MJH/"fund", assign all right, title and interest in the NOTE to the fund/MJH, which would

14   eliminate PERNICE's current claim against GRP;

15          47.     Further, KIMMINS, the last minute, inserted a conversion feature into the NOTE,

16   pursuant to which KIMMINS would be able to get 675,755 shares of GRP stock in exchange for the

17   NOTE balance (meaning KIMMINS could not only get shares at an under market price of $0.30 per

18   share, but also get a discount of more than $66,000 on these shares based on a NOTE balance of

19   $186,507.76) as more specifically set forth in the DSPA, Exhibit 3.

20          48.     In furtherance of the Oral Agreement, in or about June, 2010, an escrow account was

21   opened by the attorney for PERNICE for deposit of the funds pursuant to the DSPA.

22          49.     Plaintiff, PERNICE, has performed all of the conditions, and covenants required of him

23   under the terms of the ORAL AGREEMENT.

24          50.     As of the present time, KIMMINS has delayed,  continues to delay and has failed to

25   perform the agreed upon transaction, i.e. purchase GRP's liability to PERNICE"; purchase all of

26   PERNICE's right, title and interest in and to the Debt Security (the NOTE), in consideration for a

27   discounted purchase price of an "immediate" lump sum of $120,000 (the ORAL AGREEMENT), as

28

COMPLAINT                                    10

1    more specifically set forth in the Debt Sale and Purchase Agreement ("DSPA") between PERNICE and

2    MJH  as promised.

3        51.     On or about June 2010 and continuing thereafter, DEFENDANTS breached the Oral

4    Agreement as follows:

5          a.     DEFENDANTS failed to purchase the GRP liability to PERNICE for the

6    amounts owing to PERNICE with respect to PERNICE's exercise of the Put Options; failed to  assume

7    the right, title and interest in and to the unsecured Debt Security as agreed between PERNICE and

8    DEFENDANTS;

9          b.     DEFENDANTS failed to purchase the PERNICE debt security (the NOTE) for

10    a discounted purchase price in exchange for an "immediate" lump sum of $120,000 (the Oral

11    Agreement), or in any other amount;

12          c.     In or about June 2010, KIMMINS failed to purchase the PERNICE debt security

13    (the NOTE) in accordance with the Purchase Agreement and Board of Directors Resolution from

14    KIMMINS' "fund" (MJH);

15          d.     In or about June, 2010, DEFENDANTS failed to deposit $120,000, the "lump

16    sum" discounted purchase price (or any other amount), as agreed, in the escrow account, opened by the

17    attorney for PERNICE for deposit of the funds from DEFENDANTS.

18          e.     In or about September and October, DEFENDANTS failed to deposit $120,000,

19    the "lump sum" discounted purchase price (or any other amount), as agreed, and as memorialized in the

20    Debt Sale and Purchase Agreement between PERNICE and MJH (Sept.2010) and memorialized in the

21    Debt Sale and Purchase Agreement between PERNICE and the unknown private "fund" (October

22    2010).

23        52.     PERNICE demanded a payment of all monies due to PERNICE from DEFENDANTS.

24        53.     Even though PERNICE has repeatedly demanded that DEFENDANTS perform under

25    the terms of the ORAL Agreement, in breach of the ORAL Agreement, DEFENDANTS  failed and

26    refused to perform as agreed, failed and refused to pay PERNICE as agreed.

27    ///

28

COMPLAINT                  11

54.     As a direct and foreseeable result of DEFENDANTS' breach of the Oral Agreement, PERNICE has been damaged in accordance with the terms of the Oral Agreement in a sum to be determined at time of trial but in no event less than $186,507.76

### FOURTH CAUSE OF ACTION

**(Negligent Misrepresentation)**

(As Against All DEFENDANTS)

55.     Plaintiff realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 19 of the General Allegations and paragraphs 20 through 30 of the First Cause of Action and paragraphs 31 through 42 of the Second Cause of Action and paragraphs 43 through 54 of the Third Cause of Action as though set forth in full herein.

56.     Pursuant to the UHC and PERNICE Stock Option Agreements, 2004, 2005 and 2006 (collectively the "Written Contract"): PERNICE was issued Stock Options by UHC; and subsequent to the purchase/investment in UHC by BLACKWOOD/GRP, in or about 2006, GRP modified the UHC/BLACKWOOD/GRP Option Agreement via amendment to grant Option Holder/PERNICE "Put Options" to be exercised in or about April 1, 2008 to April 10, 2008, as more specifically set forth above in the General Allegations and Written Agreement incorporated herein as though set forth in full (Exhibit 1 ).

57.     In or about April 1, 2008, PERNICE timely exercised his "Put Options" with BLACKWOOD/GRP as agreed.

58.     In or about April 1, 2008, upon exercise of the PERNICE "Put Options", GRP negotiated with all of the Put Holders to accept a long term promissory note (the NOTE) to defer performance on the Put Options into 2011 with an option to extend.  PERNICE did not accept the terms of the NOTE. (Exhibit 2)

59.     PERNICE negotiated a separate Agreement with the CEO of GRP/BLACKWOOD, Andrew KIMMINS (the ORAL Agreement).

60.     Beginning in or about February 2010 through Sept./Oct. 2010, KIMMINS, CEO for GRP, promised to PERNICE, inter alia, the following:

---

COMPLAINT                                   12

a.    Private purchase by KIMMINS and/or KIMMINS' "fund" (based on knowledge and belief to be MJH), of GRP's liability to PERNICE, i.e., purchase of the debt security (the NOTE) from GRP, as more specifically set forth in the "Debt Sale and Purchase Agreement" and its Exhibits A and B ("Debt Sale and Purchase Agreement" and "General Release") between PERNICE and MJH Asset Management SA ("MJH" owned by KIMMINS), attached hereto as Exhibit 3  incorporated herein by this reference as though set forth in full.

b.    The purchase of the debt security, the NOTE, from GRP to PERNICE, was to be purchased by KIMMINS,  by MJH, or other private fund owned by KIMMINS in accordance with the proposed Debt Sale and Purchase Agreement (DSPA), its Escrow Agreement (Exh. B), and Assignment of Debt (Exh.A) (September 2010) between PERNICE (Seller) and MJH (Purchaser), the ORAL CONTRACT, as more specifically described in the Third Cause of Action and incorporated herein by this reference.

c.    KIMMINS'/MJH private fund would assume the right and debt obligation of the Stock Option Agreements and the GRP liability to PERNICE (the "WRITTEN CONTRACT", Exhibit 1), as memorialized in, and in accordance with, the Assignment of Debt, the NOTE ( Exhibit A) and "Release of Claim", (Exhibit B), Assignment of Debt, Escrow Agreement and Promissory Note, of the Debt Sale and Purchase Agreement). (Exhibit 3)

d.    An Agreement was made between PERNICE and KIMMINS/MJH and/or other private KIMMINS "fund" for a discounted purchase price in exchange for an "immediate" lump sum of $120,000 as set forth in the Debt Sale and Purchase Agreement and its Exhibits (the Oral Agreement).

e.    Further, in accordance with the DSPA, KIMMINS/MJH would have PERNICE convert the amounts owing to him with respect to the exercise of the Put Option into a convertible NOTE that would then be purchased by KIMMINS at a discount.

f.    Continuing from February 2010 until January 2011 (when KIMMINS ceased communication with PERNICE), KIMMINS/MJH repeatedly restated and reassured PERNICE of KIMMINS's intent to purchase the GRP liability to PERNICE, i.e., the GRP NOTE to PERNICE.

COMPLAINT                    13

g.      KIMMINS/MJH made repeated phone calls and sent numerous emails to PERNICE reiterating his intention to purchase the GRP NOTE to PERNICE, as agreed.

61.      The representations made by GRP/KIMMINS and MJH to PERNICE were untrue. The true facts were as follows:

a.      GRP/KIMMINS and MJH did not privately purchase the GRP NOTE to PERNICE as promised;

b.      Neither KIMMINS nor his private fund (whether MJH or another private fund of KIMMINS) assumed the right and debt obligation of the Stock Option Agreements (WRITTEN CONTRACT) of the GRP unsecured NOTE to PERNICE , in accordance with the Debt Sale and Purchase Agreement and Assignment of Debt ( Exhibit A) and Escrow Agreement (Exhibit B) (Exhibit 3).

c.      Neither KIMMINS/MJH nor any other private KIMMINS "fund", purchased the unsecured NOTE from GRP to PERNICE  for a discounted purchase price in exchange for an "immediate" lump sum of $120,000 as set forth in the Debt Sale and Purchase Agreement and its Exhibits, (the Oral Agreement), or for any other amount.

d.      KIMMINS, the last minute, inserted a conversion feature into the NOTE, pursuant to which KIMMINS would be able to get 675,755 shares of GRP stock in exchange for the NOTE balance (meaning KIMMINS could not only get shares at an under market price of $0.30 per share, but also get a discount of more than $66,000 on these shares based on a NOTE balance of $186,507.76) as more specifically set forth in the DSPA, Exhibit 3.

e.      KIMMINS/MJH ceased communication with PERNICE whether by telephone, email, correspondence, or in any other form.

62.      KIMMINS had no reasonable ground for believing these representations were true when KIMMINS and all entity DEFENDANTS made these representations;

63.      KIMMINS and the entity DEFENDANTS made these representations without any intention of performing the representations;

///

COMPLAINT                                        14

64.    KIMMINS and the entity DEFENDANTS intended that PERNICE rely on these representations;

65.    PERNICE was unaware of the falsity of the representations; and acted in reliance upon the truth of the representation and was justified in relying upon the representations of KIMMINS/DEFENDANTS.

66.    Had PERNICE known the true facts of KIMMINS/DEFENDANTS intent to promise to purchase the unsecured GRP NOTE to PERNICE and then fail and refuse to make the purchase of the NOTE, as set forth in the paragraphs of the First and Third Causes of Action above, and other misrepresentations regarding the Written and Oral Contracts, PERNICE would not have relied on KIMMINS/DEFENDANTS' misrepresentations; PERNICE would not have entered into the Oral Agreement with KIMMINS/DEFENDANTS, as set forth in the First and Third Causes of Action herein.

67.    These representations were made by KIMMINS/DEFENDANTS with the following intent:

a.    To induce PERNICE to act in the manner herein alleged above for KIMMINS/DEFENDANTS' own personal profit and benefit;

b.    To induce PERNICE to convert his Put Option into a NOTE that would eliminate his current claim against GRP;

c.    To induce PERNICE to convert his Put Option into a NOTE that would eliminate his current claim against the company as a condition precedent to performance/payment by KIMMINS/DEFENDANTS; and thereafter, fail to deposit the purchase money into the Escrow account, as promised;

d.    To insert a conversion feature into the NOTE, at the last minute, pursuant to which KIMMINS/MJH would be able to get 675,755 shares of GRP stock in exchange for the NOTE balance, i.e., KIMMINS/MJH could not only get shares at an under market price of $0.30 per share, but also get a discount of more than $66,000 on these shares based on the NOTE balance of $186,507.76, plus interest, in that KIMMINS/MJH was buying for $120,000;

///

COMPLAINT                          15

e.      To stall and to induce PERNICE to give up on his claim to the amounts owing to PERNICE for the purchase of the Put Option;

f.      To induce PERNICE to act in the manner herein alleged, which would allow KIMMINS to set up a fraudulent scheme to buy shares at below market prices, thereby breaching KIMMINS' fiduciary duty to GRP;

g.      To induce PERNICE to allow KIMMINS/DEFENDANTS to stall the purchase beyond the sale/purchase date agreed upon between the parties, buy shares at below market prices, get a discount on the shares based on the NOTE balance, all to the benefit of DEFENDANTS and to the financial detriment of PERNICE;

h.      To induce PERNICE to rely on the representation that independent of any other purchase agreement or conditions regarding purchase of the NOTE, with any other parties, PERNICE would be paid all monies agreed upon for the purchase of the GRP NOTE to PERNICE;

i.      To induce PERNICE to rely, in good faith, that DEFENDANTS would disclose all information and pertinent facts and conditions regarding the intent and ability of DEFENDANTS to purchase the GRP NOTE to PERNICE as promised.

68.      PERNICE at the time these representations were made by KIMMINS/DEFENDANTS, and at the time DEFENDANTS, and each of them, took the actions herein alleged, was ignorant of alleged preexisting conditions, concealment and the  falsity of DEFENDANTS', and each of them, representations and acts and therefore, had no knowledge of DEFENDANTS' (and each of them) wrongful misrepresentations and acts.

69.      These bad faith acts were committed without PERNICE's actual or constructive knowledge of DEFENDANTS' (and each of them) culpable acts. PERNICE did not know nor did PERNICE have any reasonable suspicions of DEFENDANTS' (and each of them) negligent and wrongful scheme.

70.      In reliance on these representations, PERNICE was induced to take the actions referenced herein and invest his time and expertise as a member of the Board of Directors, agree to the Stock Option Agreements, agree to the Amendment of the Stock Option Agreements giving PERNICE

COMPLAINT                                16

Put Options valued in the fixed amount of $186,507.76; and thereafter, agree to the purchase of the GRP NOTE to PERNICE by KIMMINS and his "fund"/MJH, in a lump sum reduced amount of $120,000, in accordance with the memorialization of the Oral Agreement in the Debt Sale and Purchase Agreement set forth in the First and Second Causes of Action above.

71.     PERNICE's investment of his time and expertise as a member of the Board of Directors of UHC and subsequent reliance on the representations of DEFENDANTS, and each of them, as set forth in the First through Third Causes of Action herein was justified. KIMMINS as businessman, CEO, Chairman of the Board and President of the entity DEFENDANTS, and controlling person with control over PERNICE'S Put Options, NOTE, and monies due to PERNICE, owed a fiduciary duty to PERNICE to treat PERNICE fairly and honestly. This special duty extended to any use to which KIMMINS/DEFENDANTS (and each of them) put the monies owed to PERNICE pursuant to the GRP NOTE, and held by KIMMINS/DEFENDANTS; and, extended to DEFENDANTS' use of the monies owed to PERNICE, in accordance with the WRITTEN and ORAL contracts as alleged herein.

72.     KIMMINS owed a fiduciary duty to PERNICE. As a party to a contract with KIMMINS, PERNICE was in a substantially vulnerable position to KIMMINS, controlling person, CEO and Chairman of the Board of GRP/BLACKWOOD, with complete control and management over the liability to PERNICE for the amounts owing to PERNICE with respect to the PERNICE Put Options, over the funds owed to PERNICE for the GRP NOTE, giving rise to equitable concerns underlying the protection afforded to PERNICE by law governing fiduciaries.

73.     DEFENDANTS, and KIMMINS as controlling person, Chairman of the Board, held the monies owed to PERNICE, pursuant to the GRP NOTE, in trust; DEFENDANTS were required to exercise good faith and ordinary care in the ownership and management of PERNICE's interest, and were governed by the duty to seek the best interest of PERNICE.

74.     Although it was foreseeable, and DEFENDANTS, and each of them, knew that their failure to purchase the GRP NOTE to PERNICE as promised, intention to get PERNICE to convert his Put Option into a NOTE that would eliminate PERNICE's current claim against GRP, intention not to pay PERNICE for the monies owned to PERNICE, and further, intention to retain the funds for their

COMPLAINT                    17

own use and benefit rather than purchasing the NOTE and paying PERNICE , would result in loss of funds by PERNICE, DEFENDANTS nevertheless negligently failed to disclose their intent to withhold and to refuse to pay for and purchase the GRP NOTE to PERNICE, in accordance with PERNICE's agreement with DEFENDANTS.

75.    KIMMINS as controlling person, Chairman of the Board, owed a fiduciary duty to GRP. KIMMINS fraudulent scheme to get PERNICE to convert his Put Option into a NOTE that would eliminate PERNICE's current claim against the company/GRP, to purchase the NOTE at a discount price, and subsequently not to pay PERNICE for the monies owed to PERNICE by the GRP NOTE as agreed, was a breach of KIMMINS fiduciary duty to GRP.

76.    As a direct and proximate result of DEFENDANTS' acts described herein, namely the failure to pay PERNICE the monies due to him with respect to Put Options and/or the Oral Agreement, PERNICE suffered money damages in an amount to be determined at trial, but no event less than $186,507.76.

## FIFTH CAUSE OF ACTION

**(Intentional Misrepresentation)**

(As Against All DEFENDANTS)

77.    Plaintiff realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 19 of the General Allegations and paragraphs 20 through 30 of the First Cause of Action, paragraphs 31 through 42 of the Second Cause of Action,  paragraphs 43 through 54 of the Third Cause of Action and paragraphs 55 through 76 of the Fourth Cause of Action as though set forth in full herein.

78.    Beginning on or about 2004 through 2008, PERNICE and DEFENDANTS (and each of them) entered into the WRITTEN CONTRACT and ORAL Agreement as more specifically set forth in the Third Cause of Action incorporated herein by this reference as though set forth in full.

79.    On or about February 2010, KIMMINS, CEO for GRP, made promises to PERNICE, as more specifically set forth in Fourth Cause of Action above, paragraph 60(a-g) above and incorporated herein by this reference as though set forth in full.

COMPLAINT                    18

80.     The representations made by  GRP/KIMMINS and MJH to PERNICE were false.  The true facts were as follows:

      a.     GRP/KIMMINS and MJH did not privately purchase the GRP NOTE to PERNICE as promised;

      b.     Neither KIMMINS nor his private fund (whether MJH or another private fund of KIMMINS) assumed the right and debt obligation of the Stock Option Agreements (WRITTEN CONTRACT), of the GRP NOTE to PERNICE, accordance with the ORAL CONTRACT as memorialized in the Debt Sale and Purchase Agreement and Assignment of Debt ( Exhibit A) and Escrow Agreement (Exhibit B) and its Promissory Note.

      c.     Neither KIMMINS/MJH and/or any other private KIMMINS "fund" purchased the GRP NOTE to PERNICE for a discounted purchase price in exchange for an "immediate" lump sum of $120,000 as set forth in the Debt Sale and Purchase Agreement and its Exhibits, (the Oral Agreement), or for any other amount.

      d.     KIMMINS, the last minute, inserted a conversion feature into the NOTE, pursuant to which KIMMINS would be able to get 675,755 shares of GRP stock in exchange for the NOTE balance (meaning KIMMINS could not only get shares at an under market price of $0.30 per share, but also get a discount of more than $66,000 on these shares based on a NOTE balance of $186,507.76) as more specifically set forth in the DSPA, Exhibit 3.

      e.     KIMMINS intentionally made excuses, misled, manipulated, lured, delayed and deceived PERNICE into relying and  believing KIMMINS' false and misleading statements as follows: (See Emails from KIMMINS to PERNICE, Exhibit 4) .

      i.     PERNICE: 9/29/10 "Andrew" ("KIMMINS")- "we didn't hear from you today.  Can you give us an update?"

      KIMMINS; 9/30/10  "Whilst we have been waiting for the final signature to the UWC our lawyers have uncovered a trigger that this agreement will trip, which means we are going to have to redraft some of the documents.  Exh. 4, p. 1

///

---

COMPLAINT               19

1     ii.     PERNICE: 10//7/10 "Andrew-tried you a couple times on the cell. An

2  update you can share yet please?  Exh. 4, p.3

3               KIMMINS: 10/11/10 "Brutal week of meetings every 2 hours-got home

4  exhausted...."  Exh. 4, p.3

5               PERNICE; 10/12/10 "Andrew- left you a vm-please call me on my

6  cell...." Exh. 4., p.3

7               KIMMINS: 10/13/10 "I have spent many hours trying with our lawyers

8  to find a way around the conundrum...Please call to discuss- I apologize for the delay but with my travel

9  schedule and trying to get around this problem time has slipped bye." " If we can agree this we can redo

10  the docs and close into Escrow immediately."  Exh. 4 pp. 2-3

11              PERNICE: 10/18/10 "Andrew- I have tried unsuccessfully to reach you

12  via phone and email to discuss this latest "conundrum." Exh. 4 p.2

13              KIMMINS: 10/20/10 "We will talk today- I have been pretty much on

14  the road and quite a rough one at that." Exh. 4, p.2

15     iii.     PERNICE: 10/28/10 "Andrew- thought I had a missed call from you?

16  Please call my cell....awaiting final documents." Exh. 4, p.4

17              KIMMINS:  10/29/10 "Was on a conference call with the guys in

18  California until my flight took off!" Exh. 4, p.4

19              PERNICE: 11/1/10 "Andrew-looking forward to seeing something today -

20  realize it is evening for you.  Anything to share yet?" Exh. 4 p.5

21              KIMMINS: 11/3/10 "In Oslo - heading home - you are top of the agenda

22  for tomorrow." Exh.4, p.5

23     iv.     PERNICE: 11/9/10 "Andrew - In your correspondence to me last Monday,

24  you indicated I was at the "top of the agenda"- which now another seven days have passed with yet

25  again no communication today.  We were slated to "close" a transaction over a month ago, which has

26  now repeatedly slipped from month, to month.  As you can understand, it is not providing confidence

27  to the validity o this transaction let alone consummating our agreement.  I think it is fair to say I have

28

COMPLAINT                    20

been abundantly patient." "While I would be very pleased to close this agreement with you, I can no longer continue to let months pass n addition to incurring legal expenses for a closing that I was led to believe was imminent." "I am willing to give you additional time, but unless you are able to close a deal by this Friday, I will be turning this over to counsel to pursue a legal remedy. It is regrettable, but I am sure you understand my position after nearly ten months of wrangling." Exh.4, p.7

KIMMINS: 11/11/10 "In Oslo - have been all week - had a crisis to deal with with our Secured Note Holders - nearly solved but feel free to call me....otherwise I will be back at my office on Monday." Exh.4, p.6

v.      PERNICE: 11/16/10 "Andrew- has your crisis subsided? I have tried to call you several times but your phone is not accepting incoming calls. Any other Swiss numbers are not working either. Can you provide a number or please call me with a status of where we stand?" Exh. 4 pp. 8-9

KIMMINS: 11/17/10 "Back in Geneva with the process under control and would like to speak tomorrow as I have a manic catch up day today and am waiting for various timings." Exh. 4, p.8

vi.      KIMMINS: 11/30/10 "Major issues still in the works with the our Convertible Note Holders but I expect to have this resolved by the end of next week. This will leave the way clear for us to finally put this deal behind us." Exh. 4, p.11

vii.      KIMMINS: 12/23/10 "We have had a very stressful and difficult end to the year. We have financing escrowed and ready to go, which will release the liquidity for your transaction, however, our Secured Note Holders have run us ragged getting the necessary consents to the extent that our funders now want to take them out as part of the Financing. This will mean that we will slide into 2011 before this s closed - most probably 8, 9, 10 of January close. I know it is hard for you to credit but it is still my desire and intention to do this trade and I hope by the time we get to a close you are still n place to close also." Exh. 4, p. 12

///

///

COMPLAINT                                          21

viii.    KIMMINS: 1/05/11 "We are, I believe, finally on the right track. I very much want to catch up with you so will try and call later today. I am in Switzerland and available on my swiss cellphone if you wish to call." Exh. 4, p.14

ix.    PERNICE: 1/21/11 "I know we have been playing a lot of email tag and missing our scheduled calls. I would like to hear your thoughts- proposal to a payment arrangement for the obligation the company has to me. Please give this some attention and email me a plan as we have not been able to connect for too long a time and I can't wait any longer for us to try and match schedules. I would like to at least get an email dialogue going so we can move forward and resolve this." Exh. 4, p. 16

PERNICE: 2/1/11 "Andrew - I have not heard back from my previous email below. I must move forward now but wanted to give you one more opportunity to reply and offer a settlement arrangement. I truly look forward to hearing." Exh.4, p.16

KIMMINS: 2/2/11 "Let's do it tomorrow - I blame it in California - you are on my list every morning but by the time you are up my day is chaos!!" Exh. 4, p.16.

f.    After February, 2011, GRP/KIMMINS/MJH ceased communication with PERNICE whether by telephone, email, correspondence, or in any other form.

81.    KIMMINS/DEFENDANTS, and each of them, knew that these representations were false when KIMMINS/DEFENDANTS made these representations, must have known these representations were false, or did not believe the representations to be true.

82.    KIMMINS/DEFENDANTS, and each of them, made these representations without any intention of performing the representations; and made the representations with the intent to induce PERNICE to enter into the transaction, i.e., the Oral Agreement wherein KIMMINS/DEFENDANTS (and each of them) would purchase the GRP NOTE to PERNICE in accordance with the ORAL Agreement as more specifically set forth above in the Third Cause of Action above.

83.    PERNICE relied on the representations of the ORAL Agreement made by KIMMINS/DEFENDANTS (and each of them)

84.    KIMMINS/DEFENDANTS intended that PERNICE rely on these representations;

COMPLAINT                          22

85.     These representations were made by KIMMINS/DEFENDANTS with the following intent:

a.     To induce PERNICE to act in the manner herein alleged above for KIMMINS/DEFENDANTS' own personal profit and benefit;

b.     To induce PERNICE to convert his Put Option into a NOTE that would eliminate his current claim against GRP;

c.     To induce PERNICE to convert his Put Option into a NOTE that would eliminate his current claim against the company as a condition precedent to performance/payment by KIMMINS/DEFENDANTS; and thereafter, fail to deposit the purchase money into the Escrow account, as promised;

d.     To insert a conversion feature into the NOTE, at the last minute, pursuant to which KIMMINS/MJH would be able to get 675,755 shares of GRP stock in exchange for the NOTE balance, i.e., KIMMINS/MJH could not only get shares at an under market price of $0.30 per share, but also get a discount of more than $66,000 on these shares based on the NOTE balance of $186,507.76, plus interest, in that KIMMINS/MJH was buying for $120,000;

e.     To stall and to induce PERNICE to give up on his claim to the amounts owing to PERNICE for the purchase of the Put Option;

f.     To induce PERNICE to act in the manner herein alleged, which would allow KIMMINS to set up a fraudulent scheme to buy shares at below market prices, thereby breaching KIMMINS' fiduciary duty to GRP;

g.     To induce PERNICE to allow KIMMINS/DEFENDANTS to stall the purchase beyond the sale/purchase date agreed upon between the parties, buy shares at below market prices, get a discount on the shares based on the NOTE balance, all to the benefit of DEFENDANTS and to the financial detriment of PERNICE;

h.     To induce PERNICE to rely on the representation that independent of any other purchase agreement or conditions regarding purchase of the NOTE, with any other parties, PERNICE would be paid all monies agreed upon for the purchase of the GRP NOTE to PERNICE;

i.      To induce PERNICE to rely, in good faith, that DEFENDANTS would disclose all information and pertinent facts and conditions regarding the intent and ability of DEFENDANTS to purchase the GRP NOTE to PERNICE as promised.

86.    PERNICE at the time these representations were made by KIMMINS/DEFENDANTS, and at the time DEFENDANTS, and each of them, took the actions herein alleged, was ignorant of the concealment and the  falsity of DEFENDANTS', and each of them, representations and acts and therefore, had no knowledge of DEFENDANTS' (and each of them) wrongful misrepresentations and acts.

87.    These bad faith acts were committed without PERNICE's actual or constructive knowledge of DEFENDANTS' (and each of them) culpable acts and with complete indifference to and conscious disregard for the best interests of PERNICE, in derogation of the rights of PERNICE.

88.    PERNICE did not know nor did PERNICE have any reasonable suspicions of DEFENDANTS' (and each of them), concealment, falsity of KIMMINS/DEFENDANTS' representations or wrongful scheme.

89.    In reliance on these representations, PERNICE was induced to take the actions referenced herein and invest his time and expertise as member of the Board of Directors, agree to the Stock Option Agreements, agree to the Amendment of the Stock Option Agreements giving PERNICE  Put Options valued in the fixed amount of $186,507.76; and further, agree to the purchase by KIMMINS and his "fund"/MJH in a lump sum reduced amount of $120,000,  in accordance with the Debt Sale and Purchase Agreement set forth in the First and Third Causes of Action above; and further, to have counsel for  PERNICE open an escrow account at his law firm for the deposit of funds; and incurred legal fees related to opening the escrow account.

90.    PERNICE's investment of his time and expertise as a member of the Board of Directors of UHC and subsequent reliance on the representations of DEFENDANTS, and each of them, as set forth in the First and Third Causes of Action herein was reasonable and justified. KIMMINS as businessman, controlling person and CEO, Chairman of the Board and President of the entity DEFENDANTS,  with control over the GRP NOTE to PERNICE, owed a fiduciary duty to PERNICE  to treat PERNICE fairly

1 | and honestly.  This special duty extended to any use by KIMMINS/DEFENDANTS of the GRP NOTE

2 | to PERNICE held by KIMMINS/DEFENDANTS (and each of them).

3 |       91.    Although it was foreseeable, and DEFENDANTS, and each of them, knew that their

4 | failure to purchase the GRP NOTE to PERNICE, as promised,  intention not to pay PERNICE for the

5 | funds owed to PERNICE for the  GRP NOTE, intention to get PERNICE to assign all his right, title and

6 | interest in the NOTE and give up PERNICE's claim to the amounts owed to him pursuant to the NOTE,

7 | to give up PERNICE's claim as a condition precedent to payment by DEFENDANTS, and intention to

8 | retain funds owed to PERNICE for their own use and benefit rather than paying PERNICE, would result

9 | in loss of monies by PERNICE,  DEFENDANTS  nevertheless failed to disclose their intent to stall,

10 | withhold and to refuse to pay PERNICE for the funds owed pursuant to the GRP NOTE to PERNICE,

11 | in accordance with WRITTEN/ORAL agreements with DEFENDANTS .

12 |       92.    As a direct and proximate result of DEFENDANTS' acts described herein, namely the

13 | failure to pay PERNICE the monies due to him with respect to Put Options and/or the Oral Agreement,

14 | PERNICE suffered money damages in an amount to be determined at trial, but no event less than

15 | $186,507.76.

16 |       93.    KIMMINS/DEFENDANTS' actions were outrageous and showed complete indifference

17 | to and conscious disregard for the best interests of PERNICE and was in derogation of the rights of

18 | PERNICE.  Consequently, PERNICE is entitled to exemplary and punitive damages in an amount to be

19 | proven at trial.

20 | **SIXTH CAUSE OF ACTION**

21 | **(Fraud and Deceit)**

22 | (As Against All DEFENDANTS)

23 |       94.    Plaintiff realleges and incorporates herein by reference each and every allegation set forth

24 | in paragraphs 1 through 19 of the General Allegations and paragraphs 20 through 30 of the First Cause

25 | of Action, paragraphs 31 through 42 of the Second Cause of Action,  paragraphs 43 through 54 of the

26 | Third Cause of Action, paragraphs 55 through 76 of the Fourth Cause of Action and paragraphs 77

27 | through 93 of the Fifth Cause of Action as though set forth in full herein.

28 |

COMPLAINT                    25

95.     Beginning on or about 2004 through 2008, PERNICE and DEFENDANTS (and each of them) entered into the WRITTEN CONTRACT and Oral Agreement as more specifically set forth in the First and Third Cause of Action incorporated herein by this reference as though set forth in full.

96.     On or about February 2010, KIMMINS, CEO for GRP, made promises to PERNICE, as more specifically set forth in the Fourth Cause of Action, Paragraph 60 (a-g) above and incorporated herein by this reference as though set forth in full.

97.     The representations made by   DEFENDANTS were false. The true facts were as set forth in paragraph 80 of the Fifth Cause of Action above and are incorporated herein as though set forth in full.   The true facts were as follows:

a.     GRP/KIMMINS and MJH did not privately purchase the GRP NOTE to PERNICE as promised;

b.     Neither KIMMINS nor his private fund (whether MJH or another private fund of KIMMINS) assumed the right and debt obligation of the Stock Option Agreements (WRITTEN CONTRACT), of the GRP NOTE to PERNICE, accordance with the ORAL CONTRACT as memorialized in the Debt Sale and Purchase Agreement and Assignment of Debt ( Exhibit A) and Escrow Agreement (Exhibit B) and its Promissory Note.

c.     Neither KIMMINS/MJH and/or any other private KIMMINS "fund" purchased the GRP NOTE to PERNICE for a discounted purchase price in exchange for an "immediate" lump sum of $120,000 as set forth in the Debt Sale and Purchase Agreement and its Exhibits, (the Oral Agreement), or for any other amount.

d.     KIMMINS, the last minute, inserted a conversion feature into the NOTE, pursuant to which KIMMINS would be able to get 675,755 shares of GRP stock in exchange for the NOTE balance (meaning KIMMINS could not only get shares at an under market price of $0.30 per share, but also get a discount of more than $66,000 on these shares based on a NOTE balance of $186,507.76) as more specifically set forth in the DSPA, Exhibit 3.

e.     After February, 2011, GRP/KIMMINS/MJH  ceased communication with PERNICE  whether by telephone, email, correspondence, or in any other form.

1            f.        KIMMINS sent scores of email regarding excuses and delays until approximately

2 January, 2011.

3            g.       KIMMINS intentionally made excuses, misled, manipulated, lured, delayed and

4 deceived PERNICE into relying and believing KIMMINS' false and misleading statements (See Emails

5 from KIMMINS to PERNICE, Exhibit 4) .

6            h.       In January, 2011, KIMMINS stated he was "finally ready to close", apologized

7 again for the delay; KIMMINS now stated he was securing a transaction with the company noteholders

8 which he needed to get in place first.

9            i.       KIMMINS agreed to cover PERNICE legal fees related to the Debt Sale and

10 Purchase Agreement and PERNICE's opening of an escrow account in which to deposit the expected

11 funds from KIMMINS/DEFENDANTS.

12            j.       In or about March, 2011 KIMMINS/MJH ceased communication with PERNICE,

13 whether by telephone, email, correspondence, or in any other form.

14     98.     KIMMINS/DEFENDANTS (and each of them) knew that  these representations were

15 false when KIMMINS/DEFENDANTS made these representations, must have known these

16 representations were false, or did not believe the representations to be true.

17     99.     KIMMINS/DEFENDANTS, and each of them, made these representations without any

18 intention of performing the representations; and made the representations with the intent to induce

19 PERNICE to enter into the transaction, i.e., the Oral Agreement wherein KIMMINS/DEFENDANTS

20 (and each of them) would purchase the GRP NOTE to PERNICE, in accordance with the ORAL

21 Agreement as more specifically set forth above in the First and Third Causes of Action above.

22    100.    PERNICE relied on the representations of the ORAL Agreement made by

23 KIMMINS/DEFENDANTS (and each of them).

24    101.    KIMMINS/DEFENDANTS intended that PERNICE rely on these representations;

25    102.    These representations were made by KIMMINS/DEFENDANTS with the following

26 intent:

27 ///

28

COMPLAINT                                      27

1      a.    To induce PERNICE to act in the manner herein alleged above for

2  KIMMINS/DEFENDANTS' own personal profit and benefit;

3      b.    To induce PERNICE to convert his Put Option into a NOTE that would eliminate

4  his current claim against GRP;

5      c.    To induce PERNICE to convert his Put Option into a NOTE that would eliminate

6  his current claim against the company as a condition precedent to performance/payment by

7  KIMMINS/DEFENDANTS; and thereafter, fail to deposit the purchase money into the Escrow account,

8  as promised;

9      d.    To insert a conversion feature into the NOTE, at the last minute, pursuant to

10  which KIMMINS/MJH would be able to get 675,755 shares of GRP stock in exchange for the NOTE

11  balance, i.e., KIMMINS/MJH could not only get shares at an under market price of $0.30 per share, but

12  also get a discount of more than $66,000 on these shares based on the NOTE balance of $186,507.76,

13  plus interest, in that KIMMINS/MJH was buying for $120,000;

14      e.    To stall and to induce PERNICE to give up on his claim to the amounts owing

15  to PERNICE for the purchase of the Put Option;

16      f.    To induce PERNICE to act in the manner herein alleged, which would allow

17  KIMMINS to set up a fraudulent scheme to buy shares at below market prices, thereby breaching

18  KIMMINS' fiduciary duty to GRP;

19      g.    To induce PERNICE to allow KIMMINS/DEFENDANTS to stall the purchase

20  beyond the sale/purchase date agreed upon between the parties, buy shares at below market prices, get

21  a discount on the shares based on the NOTE balance, all to the benefit of DEFENDANTS and to the

22  financial detriment of PERNICE;

23      h.    To induce PERNICE to rely on the representation that independent of any other

24  purchase agreement or conditions regarding purchase of the NOTE, with any other parties, PERNICE

25  would be paid all monies agreed upon for the purchase of the GRP NOTE to PERNICE;

26  ///

27  ///

28

COMPLAINT            28

i.      To induce PERNICE to rely, in good faith, that DEFENDANTS would disclose all information and pertinent facts and conditions regarding the intent and ability of DEFENDANTS to purchase the GRP NOTE to PERNICE as promised.

103.    PERNICE at the time these representations were made by KIMMINS/DEFENDANTS, and at the time DEFENDANTS, and each of them, took the actions herein alleged, was ignorant of the concealment and the falsity of KIMMINS/DEFENDANTS' representations, acts, scheme and ruse to stall PERNICE to get him to give up on his claim to the amounts owing to him for the Put Option as a condition precedent to performance/payment by KIMMINS/DEFENDANTS; and to insert a conversion feature into the NOTE pursuant to which KIMMINS would be able to get 675,755 shares of GRP stock in exchange for the NOTE balance as well as get a $66,000 discount on the shares based on the $186,507.76 NOTE balance that he was buying for only $120,000, and then fail perform and to pay PERNICE in accordance with the ORAL Agreement. PERNICE had no knowledge of DEFENDANTS' (and each of them) wrongful misrepresentations and acts.

104.    These bad faith acts were committed without PERNICE's actual or constructive knowledge of DEFENDANTS' (and each of them) culpable acts. PERNICE did not know nor did PERNICE have any reasonable suspicions of DEFENDANTS' (and each of them), concealment, falsity of KIMMINS/DEFENDANTS' representations or wrongful scheme.

105.    KIMMINS/DEFENDANTS (and each of them) knew that these representations, suppression of facts, positive assertion of facts were not true when KIMMINS/DEFENDANTS made these representations, assertions or suppression of facts; and/or acted in the fraudulent and deceitful manner alleged herein, without any intention of performing the acts as agreed or disclosing the deceitful, wrongful acts as alleged herein. The fraudulent and deceitful misrepresentations were made with complete indifference to and conscious disregard for the best interests of PERNICE and was in derogation of the rights of PERNICE.

106.    KIMMINS/DEFENDANTS intended that PERNICE rely on these representations, suppression of facts and positive assertion of facts which were not true.

///

COMPLAINT                                29

1    107.    PERNICE's investment of his time and expertise as a member of the Board of Directors

2  of UHC and subsequent reliance on the representations of DEFENDANTS, and each of them, as set forth

3  in the First and Second Causes of Action herein was reasonable and justified.   KIMMINS    as

4  businessman, controlling person and CEO, Chairman of the Board and President of the entity

5  DEFENDANTS,  with control over the GRP NOTE to PERNICE, owed a fiduciary duty to PERNICE

6  to  treat  PERNICE  fairly  and  honestly.      This  special  duty  extended  to  any  use  by

7  KIMMINS/DEFENDANTS of the GRP NOTE to PERNICE held by KIMMINS/DEFENDANTS (and

8  each of them).

9    108.    Although it was foreseeable, and DEFENDANTS, and each of them, knew that their

10  failure to purchase the GRP NOTE to PERNICE, as promised,  intention not to pay PERNICE for the

11  funds owed to PERNICE for the  GRP NOTE, intention to get PERNICE to assign all his right, title and

12  interest in the NOTE and give up PERNICE's claim to the amounts owed to him pursuant to the NOTE,

13  to give up PERNICE's claim as a condition precedent to payment by DEFENDANTS, and intention to

14  retain funds owed to PERNICE for their own use and benefit rather than paying PERNICE, would result

15  in loss of monies by PERNICE,  DEFENDANTS  nevertheless failed to disclose their intent to stall,

16  withhold and to refuse to pay PERNICE for the funds owed pursuant to the GRP NOTE to PERNICE,

17  in accordance with WRITTEN/ORAL agreements with DEFENDANTS.

18    109.    As a direct and proximate result of DEFENDANTS' acts described herein, namely the

19  failure to pay PERNICE the monies due to him with respect to put Options and/or the ORAL Agreement,

20  PERNICE failed to receive the monies due to him for the GRP NOTE, and therefore, suffered money

21  damages in an amount to be determined at trial, but no event less than $186,507.76.

22    110.    KIMMINS/DEFENDANTS' actions were outrageous and showed complete indifference

23  to and conscious disregard for the best interests of PERNICE and was in derogation of the rights of

24  PERNICE. Consequently, PERNICE is entitled to exemplary and punitive damages in an amount to be

25  proven at trial.

26  ///

27  ///

28

COMPLAINT                                     30

**SEVENTH CAUSE OF ACTION**

**(Breach of Fiduciary Duty)**

(As Against KIMMINS and Does 1-10)

111.   Plaintiff realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 19 of the General Allegations and paragraphs 20 through 30 of the First Cause of Action, paragraphs 31 through 42 of the Second Cause of Action,  paragraphs 43 through 54 of the Third Cause of Action, paragraphs 55 through 76 of the Fourth Cause of Action,  paragraphs 77 through 93 of the Fifth Cause of Action and paragraphs 94 through 110 of the Sixth Cause of Action as though set forth in full herein.

112.   As Chairman of the Board of Directors, CEO and President of GRP and owner/director of BLACKWOOD, who as the controlling person, had complete management and control over the GRP NOTE to PERNICE (in that PERNICE had resigned from the Board of Directors along with all Directors of UHC at the time BLACKWOOD merged/invested with UHC/GRP), KIMMINS had a fiduciary relationship with PERNICE, as well as a fiduciary duty to GRP.

113.   As a Chairman of the Board of Directors and President of GRP/BLACKWOOD, a confidential and fiduciary business relationship existed between KIMMINS and PERNICE (and between KIMMINS and GRP), in that KIMMINS, the controlling person,  had complete management and control over the GRP NOTE to PERNICE; KIMMINS had access to all corporate financial, banking, shareholder and business records; KIMMINS agreed to act in accordance with the corporate agreement and WRITTEN and ORAL contracts between the parties in the related business, i.e. PERNICE Stock Options/Put Options, as set forth in the First through Sixth Causes of Action above.

114.   KIMMINS owed a fiduciary duty to PERNICE (as well as to GRP); as a party to a contract with KIMMINS,  PERNICE was in a substantially vulnerable position to KIMMINS, CEO and Chairman of the Board of GRP/BLACKWOOD, who had complete control and management over the GRP NOTE to PERNICE, giving  rise to equitable concerns underlying the protection afforded to PERNICE by law governing fiduciaries.

///

COMPLAINT                                    31

115.    As a result of this confidential and fiduciary business relationship, KIMMINS owed to PERNICE continuing fiduciary duties not to violate the WRITTEN and ORAL Agreement between PERNICE and KIMMINS, as agreed, more specifically set forth in the First through Third Causes of Action above, and to disclose all material facts to PERNICE, to correct statements he later learned to be false, to perform all matters related to KIMMINS' management, control and supervisorial duties and fiduciary relationship with PERNICE, and to act in good faith and to refrain from acting to PERNICE'S detriment.

116.    At all material times herein, PERNICE believed implicitly in the integrity and truthfulness of KIMMINS and reposed absolute trust and confidence in him.

117.    Beginning on or about February 2010, through the present, KIMMINS breached the WRITTEN/ORAL agreement between PERNICE and KIMMINS/DEFENDANTS. KIMMINS had possession and control of the monies owed to PERNICE, in accordance with the GRP NOTE to PERNICE, and interfered with the business of BLACKWOOD/MJH/GRP and its shareholders/put option holders.

118.    The WRITTEN/ORAL contracts agreed upon between BLACKWOOD/MJH/GRP, KIMMINS and PERNICE were approved/authorized by the Board of Directors.

119.    The decision by the Board of Directors and KIMMINS to enter into the WRITTEN and ORAL contracts with PERNICE and then to breach the WRITTEN/ORAL contracts, fail and refuse to perform, fail and refuse to pay PERNICE for the NOTE as agreed, is in violation of the Business Judgment Rule in that the KIMMINS was acting in bad faith and made intentional misrepresentations to PERNICE.

120.    KIMMINS intentionally made misrepresentations to PERNICE to lure, manipulate and deceive PERNICE into agreeing to a reduced lump sum as payment for the GRP NOTE to PERNICE, signing the ORAL Agreement as a condition precedent to payment by KIMMINS/DEFENDANTS, then stalling, delaying and failing to perform, knowing KIMMINS could not or would not perform and pay PERNICE as agreed.

COMPLAINT                              32

1    121.    Instead, KIMMINS acted in a fraudulent, deceitful manner, concealing financial

2 information, concealing the fact that KIMMINS was negotiating with other Put Holders as a condition

3 precedent to performing the WRITTEN/ORAL contracts with PERNICE, in breach of the

4 WRITTEN/ORAL contracts between the parties.   KIMMINS along with the board of directors, who

5 authorized the WRITTEN/ORAL contracts,  were not acting in good faith or with the best interests of

6 the corporation or PERNICE in mind.

7    122.    KIMMINS breached his fiduciary duty to PERNICE (and to GRP) by acting in his own

8 self-interest and not in the best interests of PERNICE. KIMMINS, as an officer and Chairman of the

9 Board of GRP, deliberately usurped corporate opportunities, and failed and refused to pay PERNICE

10 for the GRP NOTE to PERNICE, as agreed.

11    123.    The decisions relative to the benefits to KIMMINS,  made by KIMMINS and Does 1

12 through 10, and each of them, were made in bad faith and/or without the requisite degree of care and

13 diligence due of fiduciaries to PERNICE.

14    124.    On or about 2010-2011, PERNICE demanded KIMMINS perform as promised and pay

15 PERNICE for the GRP NOTE to PERNICE, as agreed.

16    125.    KIMMINS has stalled, schemed, delayed, manipulated, deceived and refused and

17 continues to refuse, PERNICE's request for information concerning performance of the

18 WRITTEN/ORAL contracts; and continues to hold the funds and refuse to pay the monies due to

19 PERNICE for the GRP NOTE to PERNICE, by KIMMINS/GRP.

20    126.    As a direct and proximate result of the breaches of fiduciary duty as set forth above,

21 PERNICE has been damaged in an amount to be determined at time of trial but in no event less than

22 $186,507.76.

23    127.    In acting as herein described, KIMMINS, and Does 1 through 10, did not exercise the care

24 required of directors and officers, in that the corporation's directors, officers are fiduciaries in relations

25 to the corporation and its shareholders/option holders.  The directors and officers have a duty to exercise

26 proper care, skill and diligence in performing the duties undertaken.  This duty includes a duty of the

27 highest good faith to the corporation and the corporation's shareholders.

28

COMPLAINT                                      33

128.    The aforementioned acts of KIMMINS and Does 1 through 10, were wilfully, fraudulently and maliciously performed with the intent to injure PERNICE and did, in fact, injure PERNICE.  Consequently, PERNICE is entitled to punitive and exemplary damages in an amount according to proof at time of trial.

### EIGHTH CAUSE OF ACTION

**(Breach of Statutory Duty)**

(As against KIMMINS and Does 1-10)

129.    Plaintiff realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 19 of the General Allegations and paragraphs 20 through 30 of the First Cause of Action, paragraphs 31 through 42 of the Second Cause of Action,  paragraphs 43 through 54 of the Third Cause of Action, paragraphs 55 through 76 of the Fourth Cause of Action,  paragraphs 77 through 93 of the Fifth Cause of Action, paragraphs 94 through 110 of the Sixth Cause of Action and paragraphs 111 through 128 of the Seventh Cause of Action as though set forth in full herein.

130.    Under California Corporations Code §309(a), the Board of Directors must act in good faith and in a manner such directors believe to be in the best interests of the corporation and its shareholders/option holders and with such care, including reasonable inquiry, as an ordinary prudent person in any like position would use under similar circumstances.

131.    Under California Corporations Code §309(a), Defendant KIMMINS as a member of the Board of Directors and Chairman of the Board of Directors, had a duty to act in good faith relative to the decisions made on behalf of PERNICE.

132.    The breach of the WRITTEN/ORAL contracts alleged herein in the First and Third Cause of Action, intentional misrepresentations, fraud and deceit as more specifically set forth in the Fourth through Sixth Cause of action and incorporated herein by this reference, constitute a breach of the duty as codified in   California Corporations Code §309(a).

133.    KIMMINS' breach constitutes a fraud, either actual or constructive, by KIMMINS to PERNICE, all of which have caused PERNICE to suffer substantial damages.

///

COMPLAINT                                              34

1    134.    The aforementioned conduct of defendant KIMMINS was intentional, deceit or

2  concealment of material facts known to KIMMINS with the intention on the part of KIMMINS to hereby

3  deprive PERNICE of property or legal rights or otherwise cause injury and was despicable conduct that

4  subjected PERNICE to a cruel and unjust hardship in conscious disregard of the rights of PERNICE so

5  as to justify an award of exemplary and punitive damages in an amount according to proof at the time

6  of trial.

7            **WHEREFORE**, PLAINTIFF demands judgment against DEFENDANTS, for the

8  following:

9                         **FOR THE FIRST CAUSE OF ACTION**

10                            (Breach of Written Contract)

11    1.    General and Compensatory damages in the amount according to proof at the time of trial

12  but in no event less than  $186,507.76;

13                        **FOR THE SECOND CAUSE OF ACTION**

14                    (Breach of the Covenant of Good Faith and Fair Dealing)

15    2.    General and Compensatory damages in the amount according to proof at the time of trial

16  but in no event less than  $186,507.76;

17                         **FOR THE THIRD CAUSE OF ACTION**

18                            (Breach of Oral Contract)

19    3.    General and Compensatory damages in the amount according to proof at the time of trial

20  but in no event less than $186,507.76;

21                        **FOR THE FOURTH CAUSE OF ACTION**

22                            (Negligent Misrepresentation)

23    4.    General and Compensatory damages in the amount according to proof at the time of trial

24  but in no event less than $186,507.76;

25  ///

26  ///

27  ///

28

COMPLAINT                                35

1

**FOR THE FIFTH CAUSE OF ACTION**

2

(Intentional Misrepresentation)

3      5.      General and Compensatory damages in the amount according to proof at the time of trial

4    but in no event less than $186,507.76;

5      6.      For punitive damages in an amount according to proof;

6

**FOR THE SIXTH CAUSE OF ACTION**

7

(Fraud and Deceit)

8      7.      General and Compensatory damages in the amount according to proof at the time of trial

9    but in no event less than $186,507.76;

10      8.      For punitive damages in an amount according to proof;

11

**FOR THE SEVENTH CAUSE OF ACTION**

12

(Breach of Fiduciary Duty)

13      9.      General and Compensatory damages in the amount according to proof at the time of trial

14    but in no event less than $186,507.76;

15      10.      For punitive damages in an amount according to proof;

16

**EIGHTH CAUSE OF ACTION**

17

(Breach of Statutory Duty)

18      11.      Compensatory damages in the amount according to proof at the time of trial but in no

19    event less than $186,507.76;

20      12.      For punitive damages in an amount according to proof;

21    ///

22    ///

23    ///

24    ///

25    ///

26    ///

27    ///

28

COMPLAINT                                        36

**FOR ALL CAUSES OF ACTION**

13.  For cost of suit incurred herein;

14.  For reasonable attorney's fees incurred herein; and

15.  For such other and further relief as the Court may deem just and proper.

DATE: March 31, 2011          LAW OFFICES OF JACK UTTER

Jack Utter, Attorney for Plaintiff, Thomas Pernice

Stock Option Agreement     April 2004



September 29, 2004


Mr. Thomas Pernice
47 Chautauqua Blvd.
Pacific Palisades, CA 90272

Dear Mr. Pernice:

Enclosed you will find the original Stock Option Agreement and Amendment between yourself and United Heritage Corporation.

Sincerely,

UNITED HERITAGE CORPORATION

Sue Clifton
Sue Clifton


Enclosure


P. O. Box 1956, Cleburne, TX 76033-1956 • 2 North Caddo, Cleburne, TX 76031
(817) 641-3681 • (817) 477-5324 D/FW Metro • (817) 641-3683 FAX • http://www.unitedheritagecorp.com • uhcp@aol.com

EX. 1-1

STOCK OPTION AGREEMENT

This STOCK OPTION AGREEMENT ("Agreement") is made as of this 21st day of April 2004 between United Heritage Corporation, a Utah corporation (the "Company"), and Thomas Pernice, hereinafter called the Optionee.

The Company desires, by affording the Optionee an opportunity to purchase shares of its $0.001 par value common stock (the "Common Stock"), as hereinafter provided, to carry out the purpose of the 2000 Stock Option Plan of United Heritage Corporation (the "Plan"), approved and adopted by its directors.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth and for other good and valuable consideration, the parties hereto agree as follows:

1.      Grant of Option.  The Company hereby irrevocably grants to the Optionee the right and option (the "Option") to purchase all or any part of an aggregate of 120,000 shares of Common Stock (such number being subject to adjustment as provided in Section 8 of the Plan) on the terms and conditions herein set forth and subject further to all of the terms and provisions of the Plan which are incorporated herein by reference for all purposes.  For purposes of the Plan and this Agreement, the terms "employment" or "employ" shall also include serving as a director, officer, or consultant to the Company and/or its subsidiaries, and the term "employee" shall include any of such persons.

2.      Purchase Price.  The purchase price of the Common Stock covered by the Option shall be $0.97 per share.

3.      Term of Option.  Subject to earlier termination as provided in paragraphs 5 and 6 hereof, the term of the Option, and any limitations on number of shares or time periods that it may be exercised are as follows:

This option shall expire at 5:00 p.m. (Central Time) on April 20, 2009.  The option shall vest on April 21, 2004.

Unless otherwise stated above, the Options may be exercised, prior to expiration or termination, at any time or from time to time, as to any part or all of the shares covered thereby; provided, however, that the Option may not be exercised as to less than 100 shares at any one time (or the remaining shares then purchasable under the Option, if less than 100 shares).  The purchase price of the shares as to which the Option shall be exercised shall be paid in full in cash, or by the delivery of other shares of Common Stock of the Company, at the time of exercise and as provided by the Plan.

Except as provided in paragraphs 5 and 6 hereof, the Option may not be exercised at any time unless the Optionee shall have been in the continuous employ of the Company and/or of one or more of its subsidiaries, from the date hereof to the date of the exercise of the Option.  The holder of the Option shall not have any of the rights of a shareholder with respect to the shares

covered by the Option except to the extent that one or more certificates for such shares shall be delivered to him upon the due exercise of the Option.

4.      Nontransferability.  The Option shall not be transferable otherwise than by will or the laws of descent and distribution, or pursuant to a qualified domestic relations order as defined by the Internal Revenue Code of 1986, as amended, or Title I of the Employee Retirement Income Security Act, or the rules thereunder, and the Option may be exercised, during the lifetime of the Optionee, only by him.  More particularly (but without limiting the generality of the foregoing), the Option may not be assigned, transferred (except as provided above), pledged or hypothecated in any way, shall not be assignable by operation of law, and shall not be subject to execution, attachment or similar process.  Any attempted assignment, transfer, pledge, hypothecation or other disposition of the Option contrary to the provisions hereof, and they levy of any execution, attachment or similar process upon the Option, shall be null and void and without effect.

5.      Termination of Employment.  In the event the employment of the Optionee shall be terminated, other than with and upon the written consent of the Company, which consent may be granted or withheld solely in the discretion of the Company, or pursuant to completion of an agreement containing a specific term duration, then such Optionee's Option granted hereunder and then held by such Optionee (to the extent of the unexercised portion thereof) will be deemed to have expired on the same date as such termination occurred (or 90 days prior thereto if an Optionee attempts to exercise such Optionee's Option in anticipation of such termination).  The failure of the Company to promptly declare that such Option is deemed to have expired after the occurrence of any such event will not constitute a waiver of such right, and the Company may at any time thereafter declare such Option to have expired regardless of its actions during the interim period.  Nothing in this Agreement shall confer upon the Optionee any right to continue in the employ of the Company or of any of its subsidiaries or interfere in any way with the right of the Company or any such subsidiaries to terminate his employment at any time.

6.      Death of Optionee.  If the Optionee shall die while he shall be employed by the Company or one or more of its subsidiaries, the Option may be exercised (to the extent that the Optionee shall have been entitled to do so at the date of his death) by a legatee or legatees of the Optionee under his last will, or by his personal representatives or distributees, at any time within one (1) year after his death.

7.      Method of Exercising Option.  This Option may be exercised by written notice to the Company.

8.      Subsidiary.  As used herein, the term "subsidiary" shall mean any present or future corporation which would be a "subsidiary corporation" of the Company, as that term is defined in Section 425 of the Internal Revenue Code of 1986.

9.      Other Matters.  The Optionee acknowledges receipt of a copy of the Plan, a copy of which is annexed hereto, and represents that the Optionee is familiar with the terms and provisions thereof.  The Optionee hereby accepts this Option subject to all of the terms and

provisions of the Plan. The Optionee hereby agrees to accept as binding, conclusive and final all decisions and interpretations of the Board of Directors and, where applicable, the Stock Option Committee, upon any questions arising under the Plan or this Agreement. As a condition to the issuance of shares of Common Stock of the Company under this Agreement, the Optionee authorizes the Company to withhold in accordance with applicable law from any regular cash compensation payable to him any taxes required to be withheld by the Company under federal, state or local law as a result of his exercise of this Option.

IN WITNESS WHEREOF, the Company has caused this Agreement to be duly executed by its officers thereunto duly authorized, and the Optionee has hereunto set his hand, all on the date and year first above written.

**COMPANY:**

UNITED HERITAGE CORPORATION

By: _____

Chairman of the Board, President
and CEO

**OPTIONEE:**

_____

Thomas Perpice

(Address):_____

_____

Amendment-Stock Option Agreement     June 2004

AMENDMENT TO STOCK OPTION AGREEMENT

This AMENDMENT TO STOCK OPTION AGREEMENT ("Amendment") is made as of this 11th day of June 2004 for the purpose of amending that certain Stock Option Agreement dated the 21st day of April 2004 (the "Original Agreement") between United Heritage Corporation, a Utah corporation (the "Company"), and Thomas Pernice, hereinafter called the Optionee.

NOW, THEREFORE, for good and valuable consideration, the parties hereto agree as follows:

1.      Paragraph 5 of the Original Agreement is deleted in its entirety and the following is set forth in its place:

5      Termination.  If the Optionee's service is terminated for any reason except death, then the Optionee may exercise the Option no later than two years after the termination date.  Notwithstanding the foregoing, if the Optionee's service is terminated for cause, as defined by applicable law, neither the Optionee, the Optionee's estate nor such other person who may then hold the Option shall be entitled to exercise the Option after termination.  For the purpose of this paragraph, subject to the foregoing, termination shall be deemed to occur on the date when the Company dispatches notice or advice to the Optionee that his service is terminated.

2.      All other terms and conditions of the Original Agreement are hereby ratified and confirmed.

IN WITNESS WHEREOF, the Company has caused this Amendment to be duly executed by its officers thereunto duly authorized, and the Optionee has hereunto set his hand, all on the date and year first above written.

COMPANY:

UNITED HERITAGE CORPORATION

By: _____
        PRES: DENT

OPTIONEE:

_____
Thomas Pernice

EX. 1-5

Stock Option Agreement    May  2005



October 27, 2005

Mr. Thomas J. Pernice
27545 Pacific Coast Highway
Malibu, CA 90265

     Re:    Stock Options

Dear Tom:

Pursuant to the appropriate action of the Board of Directors of United Heritage Corporation, enclosed herewith you will find three (3) copies of your Stock Option Agreement. All three copies have been signed by the undersigned. Please execute two copies and return them to United Heritage Corporation in the self addressed envelope enclosed herewith. The third copy is for your files.

If you have any questions or comments, please do not hesitate to contact the undersigned.

Very truly yours,

UNITED HERITAGE CORPORATION

Walter G. Mize
Chairman of the Board, President and
Chief Executive Officer

WGM:cr

Enclosures

EX. 1-6

STOCK OPTION AGREEMENT

This STOCK OPTION AGREEMENT ("Agreement") is made as of this 24th day of May 2005 between United Heritage Corporation, a Utah corporation (the "Company"), and Thomas J. Pernice, hereinafter called the Optionee.

The Company desires, by affording the Optionee an opportunity to purchase shares of its $0.001 par value common stock (the "Common Stock"), as hereinafter provided, to carry out the purpose of the 2000 Stock Option Plan of United Heritage Corporation (the "Plan"), approved and adopted by its directors.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth and for other good and valuable consideration, the parties hereto agree as follows:

1.      Grant of Option.  The Company hereby irrevocably grants to the Optionee the right and option (the "Option") to purchase all or any part of an aggregate of 80,000 shares of Common Stock (such number being subject to adjustment as provided in Section 8 of the Plan) on the terms and conditions herein set forth and subject further to all of the terms and provisions of the Plan which are incorporated herein by reference for all purposes.  For purposes of the Plan and this Agreement, the terms "employment" or "employ" shall also include serving as a director, officer, or consultant to the Company and/or its subsidiaries, and the term "employee" shall include any of such persons.

2.      Purchase Price.  The purchase price of the Common Stock covered by the Option shall be $0.50 per share.

3.      Term of Option.  Subject to earlier termination as provided in paragraphs 5 and 6 hereof, the term of the Option, and any limitations on number of shares or time periods that it may be exercised are as follows:

This option shall expire at 5:00 p.m. (Central Time) on May 24, 2008.  This option shall vest immediately upon the date of grant.

Unless otherwise stated above, the Options may be exercised, prior to expiration or termination, at any time or from time to time, as to any part or all of the shares covered thereby; provided, however, that the Option may not be exercised as to less than 100 shares at any one time (or the remaining shares then purchasable under the Option, if less than 100 shares).  The purchase price of the shares as to which the Option shall be exercised shall be paid in full in cash, or by the delivery of other shares of Common Stock of the Company, at the time of exercise and as provided by the Plan.

Except as provided in paragraphs 5 and 6 hereof, the Option may not be exercised at any time unless the Optionee shall have been in the continuous employ of the Company and/or of one or more of its subsidiaries, from the date hereof to the date of the exercise of the Option.  The holder of the Option shall not have any of the rights of a shareholder with respect to the shares

covered by the Option except to the extent that one or more certificates for such shares shall be delivered to him upon the due exercise of the Option. The Option may not be exercised unless at the date of exercise a registration statement on Form S-8 under the Securities Act of 1933, as amended (the "Act"), relating to the shares covered by the Option shall be in effect, or if, in the opinion of counsel for the Company, the exercise and issuance of Common Stock would be exempt from registration requirements under the Act and under applicable securities laws. The Company is under no obligation to register the shares covered by the Option under the Act.

4.      Nontransferability. The Option shall not be transferable otherwise than by will or the laws of descent and distribution, or pursuant to a qualified domestic relations order as defined by the Internal Revenue Code of 1986, as amended, or Title I of the Employee Retirement Income Security Act, or the rules thereunder, and the Option may be exercised, during the lifetime of the Optionee, only by him. More particularly (but without limiting the generality of the foregoing), the Option may not be assigned, transferred (except as provided above), pledged or hypothecated in any way, shall not be assignable by operation of law, and shall not be subject to execution, attachment or similar process. Any attempted assignment, transfer, pledge, hypothecation or other disposition of the Option contrary to the provisions hereof, and they levy of any execution, attachment or similar process upon the Option, shall be null and void and without effect.

5.      Termination. If the Optionee's service is terminated for any reason except death, then the Optionee may exercise the Option no later than two years after the termination date. Notwithstanding the foregoing, if the Optionee's service is terminated for cause, as defined by applicable law, neither the Optionee, the Optionee's estate nor such other person who may then hold the Option shall be entitled to exercise the Option after termination. For the purpose of this paragraph, subject to the foregoing, termination shall be deemed to occur on the date when the Company dispatches notice or advice to the Optionee that his service is terminated.

6.      Death of Optionee. If the Optionee shall die while he shall be employed by the Company or one or more of its subsidiaries, the Option may be exercised (to the extent that the Optionee shall have been entitled to do so at the date of his death) by a legatee or legatees of the Optionee under his last will, or by his personal representatives or distributees, at any time within one (1) year after his death.

7.      Method of Exercising Option. This Option may be exercised by written notice to the Company.

8.      Subsidiary. As used herein, the term "subsidiary" shall mean any present or future corporation which would be a "subsidiary corporation" of the Company, as that term is defined in Section 425 of the Internal Revenue Code of 1986.

9.      Other Matters. The Optionee acknowledges receipt of a copy of the Plan, a copy of which is annexed hereto, and represents that the Optionee is familiar with the terms and provisions thereof. The Optionee hereby accepts this Option subject to all of the terms and provisions of the Plan. The Optionee hereby agrees to accept as binding, conclusive and final all decisions and interpretations of the Board of Directors and, where applicable, the Stock Option

Committee, upon any questions arising under the Plan or this Agreement. As a condition to the issuance of shares of Common Stock of the Company under this Agreement, the Optionee authorizes the Company to withhold in accordance with applicable law from any regular cash compensation payable to him any taxes required to be withheld by the Company under federal, state or local law as a result of his exercise of this Option.

IN WITNESS WHEREOF, the Company has caused this Agreement to be duly executed by its officers thereunto duly authorized, and the Optionee has hereunto set his hand, all on the date and year first above written.

COMPANY:

UNITED HERITAGE CORPORATION

By: _____
Walter G. Mize
Chairman of the Board, President
And Chief Executive Officer

OPTIONEE:

_____
Thomas J. Pernice

(Address): 27545 Pacific Coast Hwy
Malibu, CA 90265

Amendment-Stock Option Agreement    Feb. 2006

*Walter G. Mize*
P. O. BOX 1956
CLEBURNE, TEXAS 76033-1956
METRO (817) 477-5324
LOCAL (817) 641-3681
FAX (817) 641-3683

April 14, 2006

Via Certified Mail
7005 1160 0004 5384 3911

Thomas J. Pernice
27545 Pacific Coast Hwy.
Malibu, CA 90265

      Re:    Amendment to Stock Option Agreement dated February 16, 2006
              United Heritage Corporation/Thomas J. Pernice

Dear Tom:

Enclosed herewith you will find THE ONLY ORIGINAL COPY SIGNED BY UNITED HERITAGE CORPORATION OF THE REFERENCED AGREEMENT. I have retained a xerox copy of this agreement for my files in Cleburne. I will also send a xerox copy to United Heritage Corporation with the appropriate letter of delivery.

Mark your calendar for April 1, 2008 because that begins the ten day period within which you have the right to require United Heritage Corporation to purchase the options represented by the referenced agreement at a price of $4.00 per share less the purchase price. If you wish to exercise your option and receive the shares, you must do so before the expiration date of the underlying option as set out in this amendment.

I sincerely appreciate your serving on the Board of United Heritage Corporation while I was the Chairman. Even more, I appreciate your friendship.

Very truly yours,

Walter G. Mize

WGM:cr

Enclosure

EX. 1-10

## AMENDMENT TO

## STOCK OPTION AGREEMENTS

This AMENDMENT TO STOCK OPTION AGREEMENTS ("Amendment") is made as of this 16th day of February 2006 between United Heritage Corporation, a Utah corporation (the "Company"), and Thomas J. Pernice, hereinafter called the "Optionee."

The Optionee is the holder of options, granted on April 21, 2004 and May 24, 2005, respectively, from the Company's 2000 Stock Option Plan, to purchase shares of the Company's common stock, $0.001 par value (the "Common Stock") which option is memorialized in Stock Option Agreements dated April 21, 2004 (Option 1), and May 24, 2005 (Option 2), respectively, between the Company and the Optionee (the "Option Agreements").

The Company and the Optionee wish to amend the Option Agreements, as provided by Section 17 of the Plan.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth and for other good and valuable consideration, the parties hereto agree as follows:

1.     There shall be added to paragraph 2 of the Option Agreements, titled "Purchase Price", the following:

> Beginning on April 1, 2008 and ending on April 10, 2008 (the "Put Period"), the Optionee shall have the right, but not the obligation, to require the Company to purchase the Option represented hereunder at a price of $4.00 per share less the purchase price. The Optionee may exercise this right by providing 10 days notice to the Company during the Put Period. If this right is exercised by Optionee, closing and funding will be within five (5) days from date of notice. The number of shares represented by the Option and the purchase price shall be adjusted to give effect to the reverse split of the Common Stock effected by the Company on December 22, 2005.

> Beginning on April 21, 2008 and ending on May 21, 2008 (the "Call Period"), the Company shall have the right, but not the obligation, to require the Optionee to sell the Option represented hereunder at a price of $7.50 per share, less the purchase price. The Company may exercise this right by providing notice to the Optionee during the Call Period. If the Company exercises this right, closing and funding will be within five (5) days from date of notice. The number of shares represented by the Option and the purchase price shall be adjusted to give effect to the reverse split of the Common Stock effected by the Company on December 22, 2005.

2.     The second paragraph of paragraph 3, currently states for both Option 1 and Option 2,

Unless otherwise stated above, the Options may be exercised, prior to expiration or termination, at any time or from time to time, as to any part or all of the shares covered thereby; provided, however, that the Option may not be exercised as to less than 100 shares at any one time (or the remaining shares then purchasable under the Option, if less than 100 shares). The purchase price of the shares as to which the Option shall be exercised shall be paid in full in cash, or by the delivery of other shares of Common Stock of the Company, at the time of exercise and as provided by the Plan.

shall be amended to state for both Option 1 and Option 2:

Unless otherwise stated above, the Options may be exercised, prior to expiration or termination, at any time or from time to time as to any part or all of the shares covered thereby; provided, however, that if the Optionee intends to sell the Common Stock within 10 days from the date of exercise, the Optionee may (but is not required to) first notify the Company of the Optionee's intent to sell the Common Stock and the Company shall have the right, but not the obligation, for a period of 10 days following the Notice Receipt Date, to purchase the Common Stock from the Optionee at the closing price of the Common Stock on the Notice Receipt Date less the purchase price set forth in paragraph 2 (as adjusted to give effect to the reverse split of the Common Stock effected by the Company on December 22, 2005), with closing and funding to be within five (5) days, and provided, further, that the Option may not be exercised as to less than 100 shares at any one time (or the remaining shares then purchasable under the Option, if less than 100 shares). If the Company does not exercise its right to buy the shares as set out above, then, upon Optionee's exercise of its option, the purchase price of the shares as to which the Option shall be exercised shall be paid in full in cash, or by the delivery of other shares of Common Stock of the Company, at the time of exercise and as provided by the Plan.

3.      The option expiration date set forth in the first paragraph of paragraph 3 of the Option Agreements, currently states:

**Option 1**: This option shall expire at 5:00 p.m. (Central Time) on April 20, 2009
**Option 2**:      This option shall expire at 5:00 p.m. (Central Time) on May 24, 2008.

shall be amended to state:

**Option 1**: This option shall expire at 5:00 p.m. (Central Time) on March 31, 2009.
**Option 2**:      This option shall expire at 5:00 p.m. (Central Time) on March 31, 2009

4.    Paragraph 5 of the Option Agreements, which states:

> Termination of Employment.   In the event the employment of the Optionee shall be terminated, other than with and upon the written consent of the Company, which consent may be granted or withheld solely in the discretion of the Company, or pursuant to completion of an agreement containing a specific term duration, then such Optionee's Option granted hereunder and then held by such Optionee (to the extent of the unexercised portion thereof) will be deemed to have expired on the same date as such termination occurred (or 90 days prior thereto if an Optionee attempts to exercise such Optionee's Option in anticipation of such termination).  The failure of the Company to promptly declare that such Option is deemed to have expired after the occurrence of any such event will not constitute a waiver of such right, and the Company may at any time thereafter declare such Option to have expired regardless of its actions during the interim period.  Nothing in this Agreement shall confer upon the Optionee any right to continue in the employ of the Company or of any of its subsidiaries or interfere in any way with the right of the Company or any such subsidiaries to terminate his employment at any time.

shall be deleted in its entirety and the following shall appear in its place for both Option 1 and Option 2:

> Termination of Employment.  The Option granted hereunder shall not expire or terminate as a result of the termination of the Optionee's employment or other service to the Company and the Option granted hereunder shall not be subject to Section 9 of the Plan.

5.    There shall be added the following paragraph 10 to the Option Agreements:

> 10.    Notices. Unless otherwise specifically provided in this Agreement, all notices or other communications (collectively and severally called "Notices") required or permitted to be given under this Agreement, shall be in writing, and shall be given by: (A) personal delivery (which form of Notice shall be deemed to have been given upon delivery), (B) by telegraph or by private airborne/overnight delivery service (which forms of Notice shall be deemed to have been given upon confirmed delivery by the delivery agency), or (C) by electronic or facsimile transmission (including e-mail), provided the receiving party has a compatible device or confirms receipt thereof (which forms of Notice shall be deemed delivered upon confirmed transmission or confirmation of receipt).  (Any date of delivery described above shall be referred to in this Agreement as the "Notice Receipt Date".)  Notices to the Company shall be addressed to Mr. Bruce Ransom, c/o Lothian Oil Inc., 500 5th Avenue, Suite 2600, New York, New York 10110, facsimile number (212) 391-8588, e-mail bruce@lothian.us.  Notices to the Optionee shall be addressed to the Optionee at the address set forth on the execution page of this Agreement or any amendment thereto.

6.      By executing this Amendment the Company acknowledges that the Optionee is the holder of the Options, that the Options are validly issued and fully vested and that the Optionee's right to exercise the Options has not terminated or expired.

This "Amendment to Stock Option Agreement" may be executed in counterparts and with facsimile signatures with the effect as if all parties hereto had executed the same document. All counterparts shall be construed together and shall constitute a single document.

IN WITNESS WHEREOF, the Company has caused this Amendment to be duly executed by its officers thereunto duly authorized, and the Optionee has hereunto set his hand, all on the date and year first above written.

COMPANY:

UNITED HERITAGE CORPORATION

By: _____
          C. Scott Wilson
          President and CEO

ATTEST:

_____
Kenneth Levy
Secretary and CFO

OPTIONEE:

_____
Thomas T. Pernice

(Address): 27545 Pacific Coast Highway
Malibu, CA 90265

EX. 1-14

Novation & Note Acquisition Agreement    Feb.  2010

## NOVATION AND NOTE ACQUISITION AGREEMENT

This Novation and Note Acquisition Agreement (the "**Novation Agreement**") is dated effective as of February 5, 2010, by and among Glen Rose Petroleum Corporation, a Delaware corporation, (**"Glen Rose" or "Company"**) and Thomas J. Pernice (the **"Option Holder"**).

WHEREAS, Glen Rose is the successor in interest pursuant to merger of United Heritage Corporation, a Utah corporation.

WHEREAS, United Heritage Corporation entered into option agreements dated May 30, 2003 and May 24, 2005 under United Heritage Corporation's 2000 Stock Option Plan to purchase 66,667 total shares of $.001 par value stock of United Heritage Corporation at a price of $1.50 per share as adjusted for reverse stock splits.

WHEREAS, said option agreements were modified via amendment on or about February 16, 2006, to grant Option Holder a put option to require United Heritage Corporation to purchase said options for a price of $4.00 per share less the purchase price, as adjusted by reverse stock splits, of $1.50 per share by making demand between April 1, 2008 and April 10, 2008 ("Put Option")

WHEREAS, Option Holder has timely exercised his Put Option rights.

WHEREAS, Glen Rose and Option Holder intend to enter this Agreement in consideration of Option Holder's waiver of his Put Option and other rights under said option agreements and their amendments.

NOW THEREFORE, in consideration of the mutual covenants herein contained, the parties for themselves, their successors and assigns, agree as follows:

## ARTICLE I

### CANCELLATION OF OPTION HOLDER'S RIGHTS UNDER OPTION AGREEMENTS AND THEIR AMENDMENTS

Any and all of Option Holder's rights and privileges under the Stock Option Agreements of May 30, 2003, and May 24, 2005 and any and all amendments to those agreements, including the put option rights, are hereby cancelled and have no further effect.

## ARTICLE II

### ISSUANCE OF NOTE

Section 2.01   The Note.   In exchange for the release and extinguishment of any liabilities relating to Option Holder's rights and privileges under the Stock Option Agreements of May 30, 2003, and May 24, 2005 and any and all amendments to those agreements as stated in

1

EX. 2-1

Article 1 of this Agreement, the Company has authorized the issuance to the Option Holder of $186,507.76 Principal 4% Per Year Unsecured Note of the Company payable on September 30, 2011 unless extended through September 30, 2012 at the Company's option at 6% per year (the "Note").  The Note issued to the Option Holder pursuant to this Agreement may be referred to in this Agreement as the "Note."

Said Note shall be in the form attached as Exhibit A to this Agreement.

ARTICLE III
CONDITIONS TO OPTION HOLDER'S OBLIGATIONS

The obligations of Option Holder to receive the Note at the Closing are subject to the fulfillment, at or prior to such Closing, of each of the following conditions, unless otherwise waived:

Section 3.01   Representations and Warranties.   Each of the representations and warranties of the Company set forth in Article V hereof shall be true and correct on the date of the Closing.

Section 3.02   Performance.  The Company shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by the Company on or before such Closing.

Section 3.03   Certificate of Incorporation.  The Company shall have filed the Certificate of Incorporation with the Secretary of State of Delaware on or prior to the Closing, which shall continue to be in full force and effect as of the Closing.

Section 3.04   Qualifications.   All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance of the Note pursuant to this Agreement shall be obtained and effective as of such Closing and applicable state securities laws, which filings have been made or will be made by the Company in a timely manner.

ARTICLE IV
CONDITIONS TO COMPANY'S OBLIGATIONS

The obligations of Option Holder to acquire Note at the Closing are subject to the fulfillment, at or prior to such Closing, of each of the following conditions, unless otherwise waived:

Section 4.01   Representations and Warranties.   Each of the representations and warranties of the Option Holder set forth in Article VI hereof shall be true and correct on the date of the Closing.

Section 4.02   Performance.  The Option Holder shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by the Company on or before such Closing, including executing a release of claim in the form of Exhibit B to this Agreement.

2

Section 4.03   Certificate of Incorporation.  If Option Holder is a corporation or other business entity, the Option Holder shall have filed the Certificate of Formation, Certificate of Incorporation, Articles of Incorporation, Articles of Organization, or similar formational documents with the Secretary of State of the state of organization or is a duly-formed trust under the laws of the state of origination on or prior to the Closing, which shall continue to be in full force and effect as of the Closing.

Section 4.04   Qualifications.  All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful release of claim of the Note pursuant to this Agreement shall be obtained and effective as of such Closing.


ARTICLE V
REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to Option Holder as follows, each of which representation and warranty is true and correct as of the date hereof and will be true and correct as of the Closing:

Section 5.01   Organization, Qualifications and Corporate Power.  The Company is a corporation duly incorporated, validly existing and in good standing under the laws of Delaware. The Company has the corporate power and authority to own and hold its properties and to carry on its business as now conducted, to execute, deliver and perform this Agreement and to issue, deliver the Note of the Company (the "Note").

Section 5.02   Authorization of Agreements, Etc.  The execution and delivery by the Company of this Agreement, the performance by the Company of its obligations hereunder and the issuance and delivery of the Note have been duly authorized by all requisite corporate action and will not violate any provision of law, any order of any court or other agency of government, the Certificate of Incorporation, as amended, or the Bylaws of the Company, as amended, or will not result in a violation of any provision of any indenture, agreement or other instrument to which the Company, or any of its properties or assets is bound, or conflict with, result in a material breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument, or result in the creation or imposition of any lien, charge, restriction, encumbrance, or, to the Company's knowledge, claim of any nature whatsoever upon any of the properties or assets of the Company, the result of any of which would have a material adverse effect on the business or assets of the Company.

Section 5.03   Validity.  This Agreement has been duly executed and delivered by the Company and constitutes the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.  The Note, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other than applicable state and federal securities laws and liens or encumbrances created by or imposed by Option Holder. The Note will be issued in compliance with all applicable federal and state securities laws.

3

Section 5.04   <u>Governmental Approvals</u>.   No registration or filing with, or consent or approval of or other action by, any Federal, state or other governmental agency or instrumentality is or will be necessary for the valid execution, delivery and performance by the Company of this Agreement or the issuance and delivery of the Note and applicable state securities laws, which filings have been made or will be made by the Company in a timely manner.

Section 5.05   <u>Disclosure</u>.   Neither this Agreement nor any other agreement, document, certificate or written statement furnished to the Option Holder by or on behalf of the Company in connection with the transactions contemplated hereby (which has not subsequently been supplemented) contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF OPTION HOLDER

Option Holder represents and warrants to the Company that: (a) Option Holder has full power and authority to enter into and perform this Agreement in accordance with its terms; (b) Option Holder has made an investigation of the Company and its business as it deemed necessary and has had an opportunity to discuss and review the Company's business, management and financial affairs with the Company's management as it deemed necessary; (c) the Note is being acquired by Option Holder is being or will be acquired for its own account for the purpose of investment and not with a view to or for sale in connection with any distribution thereof; (d) it understands that (1) the Note has not been and will not be registered under the Securities Act by reason of their issuance in a transaction exempt from the registration requirements of the Securities Act pursuant and the regulations promulgated thereunder, (2) the Note must be held indefinitely unless a subsequent disposition thereof is registered under the Securities Act, (3) the Note will bear legends to such effect and (iv) the Company will make a notation on its transfer books to such effect.

## ARTICLE VII
## LIMITATIONS ON TRANSFERABILITY

Option Holder hereby covenants and promises that it will not transfer the Note to a third party without the written consent of the Company up to and through the time said Note is included in a securities   registration statement that has been declared effective under the Securities Act of 1933, provided, however, that there shall be no requirement of the Company's written consent if the transferee of the Note is another holder of a similar note issued to Company option holders under the Company's Stock Option Agreements of May 30, 2003, and May 24, 2005 and any and all amendments to those agreements.   Transfers of the Note in violation of written consent provisions of this Article VII are void.

EX. 2-4

ARTICLE VIII
PUBLICITY

Section 8.01   Publicity.   Option Holder acknowledges that upon the execution of this Agreement, the Company may be required to file a Form 8-K with the Securities and Exchange Commission under Items 1.01 of Form 8-K relating to the entry into a material definitive agreement or Item 8.01 for other information the Company deems important to investors and that said Form 8-K may contain a copy of this Agreement as an exhibit.   Option Holder further acknowledges that the Company may issue a press release relating to this Agreement.   The Company's decision to file a Form 8-K and attach a copy of this Agreement, or to issue a press release about this agreement, shall be within the Company's sole discretion.

ARTICLE IX
MISCELLANEOUS

Section 9.01   No Waiver; Cumulative Remedies.   No failure or delay on the part of any party to this Agreement in exercising any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.   The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 9.02   No Brokers.   No non-party to this Agreement has acted directly or indirectly as a broker, finder or financial advisor for any Party in connection with the negotiations relating to the transactions contemplated by this Agreement, and no person is entitled to any fee or commission or like payment in respect thereof based in any way on any agreement, arrangement or understanding made by or on behalf of any Party, except as stated herein.

Section 9.03   Amendments, Waivers and Consents.   Notwithstanding any other provisions of this Agreement to the contrary, changes in or additions to this Agreement may be made, and compliance with any provision herein may be omitted or waived, if the Company obtains written consent from Option Holder.

Section 9.04   Addresses for Notices, etc.   All notices, requests, demands and other communications provided for hereunder shall be in writing and mailed, sent via facsimile or hand-delivered:

If to Option Holder:

Thomas J. Pernice
27545 Pacific Coast Highway
Malibu
CA 90265

If to the Company:

Glen Rose Petroleum Corporation
22762 Westheimer Parkway, Suite 515
Katy, Houston, TX 77450
Attention: Andrew Taylor-Kimmins

or at such other address as shall be designated by Option Holder or the Company in a written notice to the other parties complying as to delivery with the terms of this Section 6.03.

All such notices, requests, demands and other communications shall be effective: (i) when mailed (registered mail, return receipt requested, postage prepaid), when deposited in the mail, (ii) when sent via facsimile, when acknowledgment of complete transmission is received, and (iii) when hand-delivered, on such date of hand-delivery, unless otherwise provided herein.

Section 9.05    Binding Effect; Assignment.  This Agreement shall be binding upon and inure to the benefit of the Company and Option Holder and their respective heirs, successors and assigns.

Section 9.06    Survival of Representations and Warranties.   All representations and warranties made in this Agreement or any other instrument or document delivered in connection herewith shall survive the execution and delivery hereof or thereof.

Section 9.07    Prior Agreements.   This Agreement constitutes the entire agreement between the parties hereto and supersedes any other prior understandings or agreements among them concerning the subject matter hereof.

Section 9.08    Severability.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

Section 9.09    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the Delaware.

Section 9.10    Counterparts.   This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Agreement by signing any such counterpart.

Section 9.11    Other Interpretive Matters.   Unless a clear contrary intention appears: (a) the singular number includes the plural number and vice versa; (b) reference to any gender includes each other gender, the masculine, the feminine and neuter; (c) reference to any agreement (including this Agreement), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof (and without giving effect to any amendment or modification that would not be permitted in accordance with the terms hereof); (d) reference to any applicable law means such applicable law as amended, modified, codified or

6

reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder and reference to any particular provision of any applicable law shall be interpreted to include any revision of or successor to that provision regardless of how numbered or classified; (e) "hereunder," "hereof," "hereto" and words of similar import shall be deemed references to this Agreement as a whole and not to any particular section or other provision hereof; and (f) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term; (g) "or," "either" and "any" are not exclusive.

Section 9.12   Construction.   The parties hereto have participated in the negotiation and drafting of this Agreement.   In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

Section 9.13   Arbitration.

(a)   Upon the request of any Party, any dispute, controversy or claim arising out of or in connection with, or relating to, employee stock options held by Option Holder, this Agreement or any breach or alleged breach hereof shall be submitted to, and settled by, binding arbitration in New York County, New York administered by the American Arbitration Association ("AAA") in accordance with the Commercial Arbitration Rules and the Optional Rules for Emergency Measures of Protection of AAA.

(b)   The disputing Parties may also agree to arbitration at any time or at any other place or under any other form of arbitration mutually acceptable to the Parties so involved.   The AAA arbitration award shall be final and binding, and a court having jurisdiction may enter judgment upon the award rendered by the arbitrator(s).

(c)   The Parties hereby irrevocably consent and submit to the jurisdiction of any federal or state court in the New York County, New York, for this purpose and waive any objections to such judgment based on venue and/or forum non conveniens.   Any provisional remedy which would be available from a court of law shall be available from the arbitrator(s) to the Parties to this Agreement pending arbitration.   Three neutral arbitrators chosen by AAA shall conduct the arbitration.

(d)   The Parties agree to request that AAA provide arbitrator(s) with experience with oil and gas exploration and production business such as Glen Rose Petroleum Corporation

(e)   The Parties shall equally bear the arbitration expenses, provided that each Party shall pay for and bear the cost of its own experts, evidence, and counsel's fees.

7

EX. 2-7

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day, month and year first above written.

**Option Holder:**

_____
Thomas J. Pernice

**Note Issuer:**

Glen Rose Petroleum Corporation
a Delaware corporation

By: _____
Name: Andrew Taylor-Kimmins
Title:   President

8

EX. 2-8

**EXHIBIT A**

**FORM OF NOTE**



THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS AS EVIDENCED BY A LEGAL OPINION OF COUNSEL TO THE TRANSFEROR TO SUCH EFFECT, THE SUBSTANCE OF WHICH SHALL BE REASONABLY ACCEPTABLE TO THE COMPANY.

Issue Date: September 24, 2010
Original Issue Date: February 5, 2010                                        $186,507.76

**AMENDED AND RESTATED**
**4% PER YEAR UNSECURED NOTE**
**DUE SEPTEMBER 30, 2011**
**(THEREAFTER EXTENDABLE AT ISSUER'S OPTION**
**TO SEPTEMBER 30, 2012 AT 6% PER YEAR)**

THIS AMENDED AND RESTATED UNSECURED NOTE amended and restates in its entirety the 4% Per Year Unsecured Note Due September 30, 2011 issued February 5, 2010, and is a duly authorized and validly issued 4% per Year Unsecured Note of Glen Rose Petroleum Corporation, a Delaware corporation (the "Company"), having its principal place of business at 22762 Westheimer Parkway, Suite 515, Katy, Houston, TX 77450 designated as its Amended and Restated 4% per Year Unsecured Note due September 30, 2011, unless extended at Company's option at a 6% per Year through September 30, 2012 (this "Note"), in the total principal sum of $186,507.76 pursuant to a signed Novation and Note Acquisition Agreement between the Company and the Holder dated February 5, 2010.

FOR VALUE RECEIVED, the Company promises to pay to Thomas J. Pernice or his registered assigns (the "Holder"), or shall have paid pursuant to the terms hereunder, the principal sum of a minimum of one hundred and eighty six thousand five hundred and seven Dollars and seventy six cents ($186,507.76) on September 30, 2011, or if extended at the option of the Company, on September 30, 2012 (the "Maturity Date") or such earlier date as this Note is required to be repaid as provided hereunder, and to pay interest to the Holder on the aggregate

then outstanding principal amount of this Note in accordance with the provisions hereof. This Note is subject to the following additional provisions:

Section 1. Definitions. For the purposes hereof, in addition to the terms defined elsewhere in this Note, (a) capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement and (b) the following terms shall have the following meanings:

"Bankruptcy Event" means any of the following events: (a) the Company or any Significant Subsidiary (as such term is defined in Rule 1-02(w) of Regulation S-X) thereof commences a case or other proceeding under any bankruptcy, reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction relating to the Company or any Significant Subsidiary thereof, (b) there is commenced against the Company or any Significant Subsidiary thereof any such case or proceeding that is not dismissed within 60 days after commencement, (c) the Company or any Significant Subsidiary thereof is adjudicated insolvent or bankrupt or any order of relief or other order approving any such case or proceeding is entered, (d) the Company or any Significant Subsidiary thereof suffers any appointment of any custodian or the like for it or any substantial part of its property that is not discharged or stayed within 60 calendar days after such appointment, (e) the Company or any Significant Subsidiary thereof makes a general assignment for the benefit of Holders, (f) the Company or any Significant Subsidiary thereof calls a meeting of its Holders with a view to arranging a composition, adjustment or restructuring of its debts or (g) the Company or any Significant Subsidiary thereof, by any act or failure to act, expressly indicates its consent to, approval of or acquiescence in any of the foregoing or takes any corporate or other action for the purpose of effecting any of the foregoing.

"Business Day" means any day except any Saturday, any Sunday, any day which shall be a federal legal holiday in the United States or any day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close.

"Note Register" shall have the meaning set forth in Section 2(b).

"Event of Default" shall have the meaning set forth in Section 5(a).

"Interest Payment Date" shall have the meaning set forth in Section 2(a).

"Original Issue Date" means the date of the first issuance of the Note, regardless of any transfers of any Note and regardless of the number of instruments which may be issued to evidence such Note.

"Agreement" means the Novation and Note Acquisition Agreement, dated as of February 5, 2010 among the Company and Thomas J. Pernice, as amended, modified or supplemented from time to time in accordance with its terms.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

EX. 2-11

"Subsidiary" shall have the meaning set forth in the Agreement.

"Trading Day" means a day on which the New York Stock Exchange is open for business.

"Trading Market" means the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question: the American Stock Exchange, the Nasdaq Capital Market, the Nasdaq Global Market, the Nasdaq Global Select Market, the New York Stock Exchange or the OTC Bulletin Board.

"Transaction Documents" shall have the meaning set forth in the Agreement.

Section 2. Interest.

a) Payment of Interest. The Company shall pay interest to the Holder on the aggregate then outstanding principal amount of this Note at the rate of 4% per year, payable on September 30, 2011 and 6% per year on the aggregate then outstanding principal amount for the period of October 1, 2011 through September 30, 2012 until paid at the Maturity Date (each such date, an "Interest Payment Date") (if any Interest Payment Date is not a Business Day, then the applicable payment shall be due on the next succeeding Business Day), in cash.

b) Interest Calculations. Interest shall be calculated on the basis of a 360-day year, consisting of twelve 30 calendar day periods, and shall accrue daily commencing on the Original Issue Date until payment in full of the outstanding principal, together with all accrued and unpaid interest, liquidated damages and other amounts which may become due hereunder, has been made. Interest hereunder will be paid to the Person in whose name this Note is registered on the records of the Company regarding registration and transfers of this Note (the "Note Register").

c) Prepayment. The Company may prepay any portion of the principal amount of this Note without the prior written consent of the Holder.

Section 3. Registration of Transfers and Exchanges.

a) Investment Representations. This Note has been issued subject to certain investment representations of the original Holder set forth in the Agreement and may be transferred or exchanged only in compliance with the Agreement and applicable federal and state securities laws and regulations.

b) Reliance on Note Register. Prior to due presentment for transfer to the Company of this Note, the Company and any agent of the Company may treat the Person in whose name this Note is duly registered on the Note Register as the owner hereof for the purpose of receiving payment as herein provided and for all other purposes, whether or not this Note is overdue, and neither the Company nor any such agent shall be affected by notice to the contrary.

Section 4. Events of Default.

EX. 2-12

a) "Event of Default" means, wherever used herein, any of the following events (whatever the reason for such event and whether such event shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

i. any default in the payment of (A) the principal amount of any Note or (B) interest, liquidated damages and other amounts owing to a Holder on any Note, as and when the same shall become due and payable (whether on the Maturity Date or by acceleration or otherwise) which default, solely in the case of an interest payment or other default under clause (B) above, is not cured within five Trading Days after notice of failure is sent by the Holder;

ii. the Company shall fail to observe or perform any other covenant or agreement contained in the Note or any of the Transaction Documents which failure is not cured, if possible to cure, within the earlier to occur of (A) five Trading Days after notice of such failure sent by the Holder or by any other Holder to the Company and (B) 10 Trading Days after the Company has become or should have become aware of such failure;

iii. any representation or warranty made in this Note, any other Transaction Documents, any written statement pursuant hereto or thereto or any other report, financial statement or certificate made or delivered to the Holder or any other Holder shall be untrue or incorrect in any material respect as of the date when made or deemed made; and

iv. the Company or any Significant Subsidiary (as such term is defined in Rule 1-02(w) of Regulation S-X) shall be subject to a Bankruptcy Event.

b) Remedies Upon Event of Default. If any Event of Default occurs, the outstanding principal amount of this Note, plus accrued but unpaid interest, liquidated damages and other amounts owing in respect thereof through the date of acceleration, shall become, at the Holder's election, immediately due and payable in cash. Commencing five days after the occurrence of any Event of Default that results in the eventual acceleration of this Note, the interest rate on this Note shall accrue at an interest rate equal to the lesser of 15% per annum or the maximum rate permitted under applicable law. Upon the payment in full, the Holder shall promptly surrender this Note to or as directed by the Company. In connection with such acceleration described herein, the Holder need not provide, and the Company hereby waives, any presentment, demand, protest or other notice of any kind, and the Holder may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable law. Such acceleration may be rescinded and annulled by Holder at any time prior to payment hereunder and the Holder shall have all rights as a holder of the Note until such time, if any, as the Holder receives full payment pursuant to this Section 5(b). No such rescission or annulment shall affect any subsequent Event of Default or impair any right consequent thereon.

EX. 2-13

Section 6. Conversion.

(a)    At any time after the date hereof until the Maturity Date, the principal and interest due under the Note shall be convertible, in whole or in part, into shares of common stock of the Company ("Common Stock") at the option of the Holder at a conversion price of $0.30 per share (the "Conversion Price"), being agreed to be 675,655 shares of Common Stock as of September 30, 2010.  No fractional shares of the Company's Common Stock will be issued upon conversion of this Note. In lieu of any fractional share to which the Holder would otherwise be entitled, the Company will pay to the Holder in cash the amount of the unconverted principal and interest balance of this Note that would otherwise be convened into such fractional share. Upon conversion of this Note pursuant to this Section 6, the Holder shall surrender this Note, duly endorsed, at the principal offices of the Company.  At its expense, the Company will, as soon as practicable thereafter, issue and deliver to the Holder, at such principal office, a certificate or certificates for the number of shares of Common Stock to which the Holder is entitled upon such conversion, together with any other securities and property to which the Holder is entitled upon such conversion under the terms of this Note, including a check payable to the Holder for any cash amounts payable as described herein. Upon conversion of this Note, the Company will be forever released from all of its obligations and liabilities under this Note with regard to that portion of the principal amount and accrued interest being converted, including without limitation, the obligation to pay such portion of the principal amount and accrued interest.

(b)    In case of any consolidation of Company with, or merger of Company into, any other entity (other than a consolidation or merger in which Company is the continuing entity), or in case of any sale or transfer (other than to a wholly-owned subsidiary) of all or substantially all of the assets of Company, the entity formed by such consolidation or the entity into which Company shall have been merged, or the entity which shall have acquired such assets, as the case may be, shall make appropriate provisions so that the holder of this Note shall have the right thereafter to convert this Note into the kind and amount of common stock or other securities and property (including cash) receivable upon such consolidation, merger, sale, or transfer by a holder of the number of shares of Common Stock into which this Note might have been converted immediately prior to such merger, consolidation, sale, or transfer.  The above provisions shall similarly apply to successive consolidations, mergers, sales, or transfers.

Section 7. Miscellaneous.

a) Notices. Any and all notices or other communications or deliveries to be provided by the Holder hereunder, including, without limitation, any Notice of Conversion, shall be in writing and delivered personally, by facsimile, or sent by a nationally recognized overnight courier service, addressed to the Company, at the address set forth above, or such other facsimile number or address as the Company may specify for such purpose by notice to the Holder delivered in accordance with this Section 6(a). Copies of all notices to the Company shall be simultaneously sent to Andrew Taylor-Kimmins, Glen Rose Petroleum Corporation, 22762 Westheimer Parkway, Suite 515, Katy, Houston, TX 77450. Any and all notices or other communications or deliveries to be provided by the Company hereunder shall be in writing and delivered personally, by facsimile, or sent by a nationally recognized overnight courier service addressed to each Holder at the facsimile number or address of the Holder appearing on the

EX. 2-14

books of the Company, or if no such facsimile number or address appears, at the principal place of business of the Holder. Any notice or other communication or deliveries hereunder shall be deemed given and effective on the earliest of (i) the date of transmission, if such notice or communication is delivered via facsimile at the facsimile number specified on the signature page prior to 5:30 p.m. (New York City time), (ii) the date immediately following the date of transmission, if such notice or communication is delivered via facsimile at the facsimile number specified on the signature page between 5:30 p.m. (New York City time) and 11:59 p.m. (New York City time) on any date, (iii) the second Business Day following the date of mailing, if sent by nationally recognized overnight courier service or (iv) upon actual receipt by the party to whom such notice is required to be given.

b) Absolute Obligation. Except as expressly provided herein, no provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of, liquidated damages and accrued interest, as applicable, on this Note at the time, place, and rate, and in the coin or currency, herein prescribed. This Note is a direct debt obligation of the Company. This Note ranks pari passu with all other Notes now or hereafter issued under the terms set forth herein.

c) Lost or Mutilated Note. If this Note shall be mutilated, lost, stolen or destroyed, the Company shall execute and deliver, in exchange and substitution for and upon cancellation of a mutilated Note, or in lieu of or in substitution for a lost, stolen or destroyed Note, a new Note for the principal amount of this Note so mutilated, lost, stolen or destroyed, but only upon receipt of evidence of such loss, theft or destruction of such Note, and of the ownership hereof, reasonably satisfactory to the Company.

d) Governing Law. All questions concerning the construction, validity, enforcement and interpretation of this Note shall be governed by and construed and enforced in accordance with the internal laws of the State of Delaware, without regard to the principles of conflict of laws thereof. Each party agrees that all legal proceedings concerning the interpretation, enforcement and defense of the transactions contemplated by any of the Transaction Documents (whether brought against a party hereto or its respective Affiliates, directors, officers, shareholders, employees or agents) shall be commenced as stated in the Agreement.

e) Waiver. Any waiver by the Company or the Holder of a breach of any provision of this Note shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Note. The failure of the Company or the Holder to insist upon strict adherence to any term of this Note on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Note. Any waiver by the Company or the Holder must be in writing.

f) Severability. If any provision of this Note is invalid, illegal or unenforceable, the balance of this Note shall remain in effect, and if any provision is inapplicable to any Person or circumstance, it shall nevertheless remain applicable to all other Persons and circumstances. If it shall be found that any interest or other amount deemed interest due hereunder violates the applicable law governing usury, the applicable rate of interest due hereunder shall automatically be lowered to equal the maximum rate of interest permitted under applicable law. The Company

covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law which would prohibit or forgive the Company from paying all or any portion of the principal of or interest on this Note as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this indenture, and the Company (to the extent it may lawfully do so) hereby expressly waives all benefits or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Holder, but will suffer and permit the execution of every such law as though no such law has been enacted.

g) Next Business Day. Whenever any payment or other obligation hereunder shall be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

h) Headings. The headings contained herein are for convenience only, do not constitute a part of this Note and shall not be deemed to limit or affect any of the provisions hereof.

i) Assumption. Any successor to the Company or any surviving entity in a Merger or acquisition shall (i) assume, prior to such Merger or acquisition, all of the obligations of the Company under this Note and the other Transaction Documents pursuant to written agreements in form and substance satisfactory to the Holder (such approval not to be unreasonably withheld or delayed) and (ii) issue to the Holder a new Note of such successor entity evidenced by a written instrument substantially similar in form and substance to this Note, including, without limitation, having a principal amount and interest rate equal to the principal amount and the interest rate of this Note and having similar ranking to this Note, which shall be satisfactory to the Holder (any such approval not to be unreasonably withheld or delayed). The provisions of this Section 6(i) shall apply similarly and equally to successive Merger or acquisitions and shall be applied without regard to any
limitations of this Note.

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by a duly authorized officer as of the date first above indicated.

**GLEN ROSE PETROLEUM CORPORATION**

By:_____
Name: Andrew Taylor-Kimmins
Title: President